COMMONWEALTH *vs.* WILLIAM H. SNOW, JR.
(and nine companion cases [1]).

Suffolk.    October 2, 1972. — June 27, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Search and Seizure.    Probable Cause.    Arrest.    Practice, Criminal,*
    Report.

An affidavit which alleged that an informant, proved reliable by his
    assistance in past drug convictions, stated that narcotics were
    being sold on certain premises, and which alleged that police offi-
    cers observed numerous "known narcotics addicts" frequenting
    those premises, was sufficient to support the issuance of a warrant
    to search the premises. [782–784]
An affidavit with no name appearing in the acknowledgment fulfilled
    the requirement of G. L. c. 276, § 2B, that an affidavit be "in sub-
    stantially the form" set out therein. [784–786]
Whether a warrant issued pursuant to G. L. c. 94, § 213, prior to
    its repeal, which commanded officers to arrest "all persons present"
    where narcotic drugs were found, violated the Federal and Mas-
    sachusetts Constitutions was irrelevant to whether the arrests of
    defendants, who were present, for possession and sale of drugs
    was lawful. [786–787]
Where a police officer saw something pass between a defendant and a
    person from whom he, as an undercover agent, had just pur-
    chased heroin, and where officers saw another defendant drop
    twenty-one bags of heroin as he tried to flee, there was probable
    cause to arrest both. [788–789]
Police officers acting under a valid warrant to search a barber shop
    had the right to order persons present but not named in the war-
    rant to remain where they were. [789]
Officers acting under a warrant to search a barber shop were em-
    powered to search a coat belonging to a defendant but hanging
    on a wall hook, and to seize the heroin found in its pocket. [789–790]
    KAPLAN, J., dissenting.

---

[1] One of the companion cases is against William H. Snow, Jr.; three
are against Tony C. Biggs (thus named in three indictments, but
sometimes referred to elsewhere in the record as "Tony Biggs," "Tony
Briggs," or "Tony C. Briggs"); two are against Curtis Herron; and
three are against Leon Marsh.

Commonwealth *v.* Snow.

TEN INDICTMENTS found and returned in the Superior Court on March 3, 1970.

An interlocutory report was made by *Taveira, J.*

*William A. Schroeder* (*Charlotte A. Perretta* with him) for the defendants.

*Robert Snider,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   This is an interlocutory report by a judge of the Superior Court under G. L. c. 278, § 30A, inserted by St. 1954, c. 528,[2] of five questions relating (a) to the validity of a warrant for the search of the premises on which the defendants were arrested, and (b) to the validity of the search and arrest of the defendants.   After holding a hearing on the defendants' pre-trial motions to suppress the evidence obtained in the searches of the premises and of their persons, the judge made findings on the factual issues raised by the motions.   He then reported his findings and five questions of law arising therefrom for decision by this court.   We summarize the pertinent portions of the facts thus found and of the record.

On February 20, 1970, Officer Thomas R. Matheson of the Boston Police Drug Control Unit who had been involved in narcotics investigations for three years applied to a District Court for a warrant to search the first floor and basement of a building identified as the Sportsman Hair Styling Salon, situated and numbered 312 Blue Hill Avenue in the Dorchester district of Boston, for "any narcotic drug, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any narcotic drug," believed to be there "kept or deposited by Tony Biggs," one of the defendants.

[2] Section 30A provides: "If, prior to the trial of a person in a criminal case in the superior court, a question of law arises which, in the opinion of the presiding justice, is so important or doubtful as to require the decision of the supreme judicial court thereon before trial, in the interest of justice, he may report the case so far as necessary to present the question of law arising therein; and thereupon the case shall be continued for trial to await the decision of the supreme judicial court."

The warrant was issued authorizing the officers executing it (a) to enter the described premises, (b) to seize any drug or related implement or paraphernalia found therein, and (c) "to arrest the person or persons in whose possession . . . [any drug] is found, together with all persons present."

Officer Matheson, together with Sergeant Doris and Officers Finnell, Cotter and Montgomery of the Boston police, then went to the area of the premises in question (barbershop) to execute the search warrant. They stopped within two blocks of the barbershop and Sergeant Doris gave Officer Montgomery who was working "undercover" two ten dollar bills after making a note of their serial numbers. Officer Montgomery went alone to the barbershop where he used the two bills to purchase two decks of heroin from the defendant Biggs. Just after the purchase Biggs went over to the defendant Snow who was in the barbershop, spoke with him, and something passed between them.

Three or four minutes after Officer Montgomery had left the other officers, they received a call from him by "walkie-talkie" radio equipment telling them he had just left the barbershop and describing what he had done and seen there. Sergeant Doris and the other officers went to the barbershop and entered it within two or three minutes after receiving the call. Officer Matheson entered first and announced in a voice loud enough for all inside to hear that they were police officers, that they had a search warrant, and that all persons in the place were to remain where they were. There were three barber chairs along the right side of the shop and six chairs for waiting customers on the left side. At the rear of the shop there was a stairway down to a lower level where there were a ladies' hair salon, a coat rack and a toilet.

Before they entered the barbershop the police knew that the defendants Biggs and Snow were in the shop but did not know that any other persons would be there. There were approximately eight persons in the shop at the time, including the four defendants. The defendant

Marsh was seated in the first barber chair and the defendant Biggs was standing at the same chair. The defendant Snow was seated in the first of the six chairs on the left side of the shop and the defendant Herron in the fourth of those six chairs.

As the police entered the barbershop, Herron ran to the rear of the shop with Sergeant Doris in close pursuit, and while running he threw twenty-one bags of heroin to the floor just before the sergeant caught and arrested him. The sergeant also found eleven additional bags of heroin in a wastebasket where Herron was standing when arrested, but he did not see Herron put those bags there.

After entering the barbershop the police officers allowed no one to leave and they searched everyone present. On the defendant Biggs's person they found three decks of heroin, and on the defendant Snow's person they found the two ten dollar bills which Officer Montgomery had previously used for his purchase of heroin from Biggs as described above. They found a deck of heroin in a coat hanging on a wall hook in the barbershop and when they asked who owned the coat the defendant Marsh admitted that it was his. After the four defendants were arrested and taken to the police station, the police made a further search and found six decks of heroin on Snow's person and twenty-four decks of heroin on Marsh's person.

As a result of the events described above, the defendants have been charged in ten separate indictments with the following crimes: each defendant has been charged with the unlawful possession of heroin, each defendant has been charged with having heroin in his possession with the intent unlawfully to sell it, the defendant Biggs has been charged with unlawfully selling heroin to Officer Montgomery, and the defendant Marsh has been charged with the unlawful possession of marihuana, a narcotic drug.[3]

---

[3] The judge's findings make no reference to marihuana. However, no part of the decision of these cases turns on whether marihuana was found in the alleged illegal searches of the premises or of the defendants.

We now consider the five questions of law which the judge determined, after finding the facts described above, to be "so important or doubtful as to require the decision of the Supreme Judicial Court thereon prior to trial in the interests of justice." Trial of the indictments was continued generally pending our decision on the questions reported.

1. *Question 1* asks whether "the affidavit for the search warrant . . . set forth sufficient facts to establish probable cause for the issuance of a search warrant." The affidavit was signed by Officer Matheson and it includes the following statements: "I am a Police Officer of the City of Boston, Drug Control Unit. . . . On 2–17–70 a reliable informant who has proved reliable in the past in the arrest and conviction of Pedro Pareda, Amado Duran, Erasmo Velasquez, Daniel Griffin and Louis Jones. All for the sale of Heroin and convicted within the past year. My informant now tells me that at 312 Blue Hill Ave., Dorchester, Sportsman Hair Styling Salon, that a man known to him as Tony Biggs is selling Narcotic Drugs, to wit: Heroin, Marijuana, Cocaine and that Tony Biggs keeps the Narcotic Drugs on his person or in his tool cabinet and that he also keeps a large amount of Narcotic Drugs in the back room (first floor) and basement at the above mentioned premises. On 2–18–70 and 2–19–70, Sgt. John Doris, Ptl. Dennis Casey and Ptl. Thomas R. Matheson while at 312 Blue Hill Ave., observed numerous known narcotic addicts entering and leaving the above premises. Tony Biggs is employed as a barber at the above premises and works at the barber chair located next to the front door at 312 Blue Hill Ave."

The defendants contend that the affidavit fails to meet the "two-pronged test" of *Aguilar* v. *Texas*, 378 U. S. 108, as interpreted by *Spinelli* v. *United States*, 393 U. S. 410, 413, that it contain (a) a statement "of the 'underlying circumstances' necessary to enable the magistrate independently to judge of the validity of the informant's conclusion" that drugs were kept unlawfully in the barbershop, and (b) statements of the affiant officer to sup-

port his claim that his informant was "credible" or that his information was "reliable." We reject both contentions.

Treating the second requirement first, "[t]he informant's reliability was established by setting forth previous examples of his assistance in apprehending drug offenders." *Commonwealth* v. *Anderson,* 362 Mass. 74, 76, and cases cited.[4]

As to the first requirement of the *Aguilar* and *Spinelli* cases, the defendants argue that the statements which are attributed to the unnamed informant in the affidavit were insufficient as matter of law to constitute probable cause for the issuance of the warrant. Such an argument assumes, without legal foundation, that the sufficiency of the affidavit rests entirely on the statements of the informant. It does not. It is not necessary for this court to determine whether those statements, standing alone, are sufficient because, even if they were insufficient, "[i]t does not follow . . . that the search warrant was issued without probable cause." *Commonwealth* v. *Anderson, supra,* at 76. "The sufficiency of the affidavit is to be decided on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone." *Commonwealth* v. *Stewart,* 358 Mass. 747, 751.

The allegation in the affidavit that on the two days preceding the application for the search warrant three police officers had "observed numerous known narcotic addicts entering and leaving" the barbershop substantially corroborated the statements of the informant. That statement is entitled to weight in the decision of the magistrate to issue the warrant. The statement in

---

[4] Footnote 1 of the *Anderson* decision indicates that the affidavit which we there held sufficient for the issuance of a search warrant referred to "[a]n informant who has proved reliable in the past in connection with the arrest and conviction of Danny Griffin, Louis Jones . . . and others for the illegal sale of Narcotic Drugs." The affidavit in the present cases describes the unnamed informant as one "who has proved reliable in the past in the arrest and conviction of . . . Daniel Griffin and Louis Jones" and three other named persons.

*Spinelli* v. *United States*, 393 U. S. 410, 414, that an "allegation that Spinelli was 'known' to the affiant and to other federal and local law enforcement officers as a gambler and an associate of gamblers is but a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision" was expressly rejected in *United States* v. *Harris*, 403 U. S. 573. In the latter case, the court said, at p. 583, "We cannot conclude that a policeman's knowledge of a suspect's reputation — something that policemen frequently know . . . — is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely in assessing the reliability of an informant's tip. To the extent that *Spinelli* prohibits the use of such probative information, it has no support in our prior cases, logic, or experience and we decline to apply it to preclude a magistrate from relying on a law enforcement officer's knowledge of a suspect's reputation." In reliance on that statement in the *Harris* case, we said in *Commonwealth* v. *Anderson, supra,* at 77, that "we therefore perceive no reason why reliance cannot be placed on a policeman's knowledge of the reputations as drug users of persons frequenting the defendant's apartment in assessing the reliability of the informant's tip."

The test of sufficiency of the allegations of the affidavit is not whether they would justify a conviction for a crime. Probable cause, by its very terms, deals with probabilities. It exists where the facts and circumstances alleged in the affidavit are sufficient in themselves to warrant an impartial magistrate to believe that an offence probably has been or is being committed.

Considering the affidavit in these cases in its entirety, and testing it by the standards discussed above, we hold that is was legally sufficient to support the issuance of the search warrant. We therefore answer question 1 in the affirmative.

2. *Question 2* asks whether "the fact that no name appears in the acknowledgment on the affidavit . . . invalidate[s] the search warrant."

General Laws c. 276, § 2B, inserted by St. 1964, c. 557, § 3, as amended by St. 1965, c. 384, requires a person seeking a search warrant to "give an affidavit in substantially the form hereinafter prescribed." The prescribed form starts with the language: "I, (name of applicant) being duly sworn, depose and say." It continues with the text of the affidavit and a line for signature by the applicant. It then concludes with the following clause: "Then personally appeared the above named ................................ and made oath that the foregoing affidavit by him subscribed is true," and a provision for a date and the signature of the judge or clerk of the court.

The affidavit in these cases starts out with the statement, "I, Thomas R. Matheson, being duly sworn, depose and say." This is followed with the factual allegations and a request for the issuance of a search warrant for the barbershop, all of which are in turn followed by the signature of "Thomas R. Matheson" over the printed words "Signature of Applicant." It concludes with the following clause: "Then personally appeared the above named and made oath that the foregoing affidavit by him subscribed is true." Below that there is the date and the signature of the clerk of the court issuing the search warrant.

The defendants contend that the entire search warrant is invalid because the name "Thomas R. Matheson" was not inserted after the words "Then personally appeared the above named" in the clause last quoted above. Section 2B, as amended, requires only that the affidavit be "in substantially the form" reproduced with the statute. The affidavit in these cases is no less "in substantially the form" prescribed by § 2B than it would have been if the name of the affiant had been inserted in the place suggested by the defendants. The defendants' argument on this point is without merit. "This is a triviality. . . . A conveyancer's precision of language is not to be expected in the affidavit." *Commonwealth* v. *Pellier*, 362 Mass. 621, 624–625, and cases cited therein. The only possible reasonable conclusion which can be drawn from

a reading of the present affidavit is that Thomas R. Matheson was the applicant for the search warrant, that he signed the affidavit, and that he, as required by § 2B, as amended, appeared before the court clerk and swore that the allegations by him subscribed were true.

We therefore answer question 2 in the negative.

3. *Question 3* asks whether "the provision contained in G. L. c. 94, section 213 and in the search warrant . . . which commands officers executing a search warrant to search for 'any narcotic drug, article, implement or paraphernalia' and if any such items are found to seize the same 'and to arrest the person in possession thereof, together with all persons present' . . . [violates] the Fourth and Fourteenth Amendment of the United States Constitution and Article XIV of the Constitution of Massachusetts as to its command that the officers 'arrest . . . all persons present' where the place to be searched is a commercial establishment open to the public." [5] For the several reasons stated below, "we hold that this is not an appropriate case in which to require this court to answer a question of constitutional proportions before the case has been decided on its merits." *Commonwealth* v. *Henry's Drywall, Inc.* 362 Mass. 552, 556.

The first reason is that G. L. c. 94, § 213, together with many other sections of the same chapter dealing with drugs, was repealed effective on July 1, 1972 (see St. 1971, c. 1071, § 2; § 9, as amended by St. 1972, c. 2), and a new chapter (c. 94C, sometimes referred to as the "Uniform Controlled Substances Act") was added. The new c. 94C does not appear to contain any provision comparable to the language of the former c. 94, § 213, which is involved in this question. There is no indication in the record that there are any other cases pending which

---

[5] In *Commonwealth* v. *Pellier*, 362 Mass. 621, 625, fn. 3, we said: "The warrant in terms authorized search of 'any person or persons present who may be found to have such property in his her or their possession or under his her or their control or to whom such property may have been delivered.' This lacks specificity and is of dubious meaning."

might be affected by any answer we might give to question 3.

The second reason is that any answer which we might give to this question is not likely to be material in the ultimate decision of these cases. *John Gilbert Jr. Co.* v. *C. M. Fauci Co.* 309 Mass. 271, 273. If we were to hold that the portion of the now repealed § 213 which is quoted in the question violated any or all of the cited constitutional provisions, it would not follow that the arrest of any of the defendants would be unlawful. The reasons for this statement are evident in the discussion of the next question below.

4. *Question 4* asks whether "the arrests made pursuant to the search warrant of the defendants, William H. Snow, Curtis Herron and Leon Marsh, whose names were not included in the affidavit or in the search warrant, [were] in the facts of the instant case valid arrests." It is not clear whether it is intended that for the purpose of this question this court should assume that these three defendants were arrested by the sole authority of the search warrant which did not name them. Whether it was so intended or not, we do not so assume. We treat this question as asking generally whether, on the facts found and reported by the judge, the arrests of the three named defendants were valid. See *Commonwealth* v. *Kelley*, 358 Mass. 43, 45–46.

The validity of the arrests did not depend solely on the validity of the search warrant or of any particular language therein. Each of the defendants was arrested for crimes punishable by imprisonment in the State prison. See G. L. c. 94, §§ 205, 212 and 212A, for punishment for crimes of possession of a narcotic drug, possession of heroin, and sale of heroin or possession thereof with intent to sell it.[6] "A crime punishable by . . . imprisonment in the state prison is a felony." G. L. c. 274, § 1.

---

[6] All of these statutes were in effect on the date of the offences charged against the defendants, but they have since been repealed by St. 1971, c. 1071, § 2.

If the arresting officers in this case had sufficient information to constitute probable cause to believe, and did believe, that any one of the defendants had committed a felony, even though not in their presence, they had the right to arrest that defendant without a warrant. *Commonwealth* v. *Phelps*, 209 Mass. 396, 403–406. *Commonwealth* v. *Holmes*, 344 Mass. 524, 525–526. *Commonwealth* v. *Lewis*, 346 Mass. 373, 382–383. *Commonwealth* v. *Mayer*, 349 Mass. 253, 255. *Commonwealth* v. *Mitchell*, 353 Mass. 426, 428–429. *Commonwealth* v. *Andrews*, 358 Mass. 721, 723–724. The police were not required to possess information sufficient to establish beyond a reasonable doubt that a defendant arrested by them had committed a felony. It was enough if they had information which reasonably permitted a conclusion that the defendant had probably committed a felony. *Commonwealth* v. *Andrews, supra,* at 723. *Commonwealth* v. *Pellier*, 362 Mass. 621, 626, and authorities cited.

The police had enough information to permit them reasonably to believe that all four defendants had probably committed one or more felonies. We hold that the police had probable cause to arrest all four defendants for such felonies without a warrant. It is not disputed that the police had probable cause to arrest Biggs without a warrant. He had actually sold heroin to Officer Montgomery. The other defendants contend that there was no probable cause to arrest them without a warrant. We therefore consider their cases.

After Officer Montgomery purchased heroin from the defendant Biggs he saw the latter go over to the defendant Snow, saw the two speak to each other, and saw something pass between them. An illegal drug transaction is commonly described by witnesses as including the passing of something between two persons, with a small packet, usually called a deck, going in one direction and money going in the other direction. Since such a transaction is illicit, the movements are by nature furtive rather than like an open, across-the-counter, com-

mercial sale of merchandise. Officer Montgomery who had some special knowledge and experience with the unlawful drug traffic could properly infer from what he saw in the barbershop that Snow was probably participating in the drug sale which had just been concluded by Biggs to Officer Montgomery.

The police saw the defendant Herron throw twenty-one bags of heroin which were in his possession to the floor while he was apparently in flight from the barbershop. He first tries to justify his attempted flight by claiming that the search warrant was invalid. If that argument were otherwise sound, it is of no avail here because we have held that the warrant was valid. He then argues that the police had no right to order persons not named in the warrant to remain on the premises. We hold that the police did have that right. They had a warrant which authorized them to search the barbershop for drugs and related contraband. They were entitled to take reasonable precautions to prevent those present from attempting to conceal, destroy or remove the contraband which was the object of the authorized search. Their requirement that all persons present when they entered the barbershop remain where they were was a reasonable step to insure the proper execution of the search warrant. The public right to the due and efficient enforcement of law and execution of legal process outweighs the temporary inconvenience to the individuals who were thus restricted in their movements in or flights from the barbershop.

In executing the search warrant the police found a deck of heroin in the pocket of a coat hanging on the wall of the barbershop. The defendant Marsh admitted to the police that the coat was his. He now argues that the police had no right to look into the coat pocket because it was in effect a search of his person which was not authorized by the search warrant. We reject any argument that the search of the coat hanging on the wall was in effect a search of the person of Marsh. *United States* v. *Teller*, 397 F. 2d 494 (7th Cir.), cert. den. sub nom. *Teller* v.

*United States,* 393 U. S. 937. *United States* v. *Johnson,* 475 F. 2d 977 (D. C. Cir.). *United States* v. *Riccitelli,* 259 F. Supp. 665 (D. Conn.). The warrant authorized a search of the entire barbershop. It did not limit the police to looking at what was in open view and thus obvious. They had the right to search anywhere within the four walls of the barbershop where the contraband described in their warrant might be located. They could search the various rooms, closets or storage places, including possible concealed storage places. They could look on, under, behind and inside any piece of furniture, container or other object in the described premises, lift or remove any object to facilitate their search, and search the pockets, liners or any other parts of articles of clothing where the objects of their search might be secreted. See *Commonwealth* v. *Todisco, ante,* 445; *United States* v. *Teller, supra; United States* v. *Johnson, supra; United States* v. *Riccitelli, supra.* Marsh's coat, while hanging on the wall, fell within the broad scope of the premises permitted to be searched under the warrant. The finding of heroin in the pocket of Marsh's coat and his admission of ownership of the coat gave the police probable cause to arrest him without a warrant.

The fact that heroin was found on the persons of Snow and Marsh after they were arrested and were being searched at the police station plays no part in the determination whether the police had probable cause to arrest them for a felony without a warrant at the barbershop. However, our holding that the arrests were lawful does have a bearing on those parts of their motions to suppress which relate to the heroin found in the police station search.

5. *Question 5* asks whether the arrests of the four defendants without a warrant were valid in the event we held the search warrant was invalid. We have held that the search warrant was valid and also that the arrests of the four defendants without arrest warrants were valid. No further answer is required to this question.

The cases are to stand for further proceedings in the Superior Court consistent with this opinion.

*So ordered.*


KAPLAN, J. (dissenting in part). I think the search of the overcoat of the defendant Marsh was illegal, though I must own that the question is a close one on which there is not much cogent authority. I would disregard the language of the warrant about "persons present" which is evidently a vestigial remain of a repealed statute. Taken merely to authorize a search of the described premises, the warrant does not cover a search of the person of a customer sitting in a barber chair. This the court's opinion concedes. But then, I submit, the same immunity should extend to that customer's briefcase within his arm's reach, and by reasonable analogy, his overcoat on a hook on the wall. The overcoat should be considered within the customer's "possession," which is to say within the ambit of his person. Another way of looking at the case is to reason that if the warrant is read to cover Marsh's overcoat, it was to that extent issued without probable cause. I believe there was a breach of Marsh's "constitutionally protected reasonable expectation of privacy" (Harlan, J., concurring in *Katz* v. *United States*, 389 U. S. 347, 360), a conclusion strengthened rather than weakened by the fact that the barbershop was a kind of public place; it invited transients who might want a haircut rather than a "fix." The nature of the locus may indeed serve to distinguish *United States* v. *Teller*, 397 F. 2d 494 (7th Cir.), cert. den. sub nom. *Teller* v. *United States*, 393 U. S. 937,[1] *United States* v. *Johnson*, 475 F. 2d 977 (D. C. Cir.) (one judge concurring in part and dissenting in part), and *United States* v. *Riccitelli*, 259 F. Supp. 665 (D. Conn.), cases cited for sustaining the present search.

---

[1] The *Teller* case rested in part on *Harris* v. *United States*, 331 U. S. 145, which was later qualified in *Chimel* v. *California*, 395 U. S. 752.