Ana Maria Caeiro PALHAVA DE
VARELLA–CID, Plaintiff,
Appellant,

v.

The BOSTON FIVE CENTS SAVINGS
BANK, and George H. Coleman,
Defendants, Appellees.

No. 85–1777.

United States Court of Appeals,
First Circuit.

Argued Jan. 10, 1986.

Decided March 26, 1986.

Amy Woodward with whom Michael B. Keating and Verne W. Vance, Jr., Boston, Mass., were on brief, for plaintiff, appellant.

Raymond J. Kenney, Jr., with whom John P. Mulvey and Martin, Magnuson, McCarthy & Kenney, Boston, Mass., were on brief, for defendants, appellees.

Before BOWNES, ALDRICH and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff-appellant, Ana Palhava de Varella-Cid (Palhava), appeals from the district court's award of summary judgment in favor of defendants-appellees, The Boston Five Cents Savings Bank (Boston Five) and George H. Coleman (Coleman), a bank security officer. Following her arrest in the Tremont Street branch of the Boston Five and subsequent criminal prosecution, Palhava brought claims against both defendants for false arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress and deprivation of her constitutional rights. Palhava concedes that the existence of probable cause to arrest and prosecute her would be fatal to all of her claims. She maintains, however, that based on the facts in the case reasonable minds could differ as to whether there was probable cause and, therefore, that summary judgment against her was inappropriate.

I

The relevant facts leading to the arrest of Palhava began on May 15, 1981, when she entered the Tremont Street branch of the Boston Five Cents Savings Bank and asked the branch manager, Stephen Kennedy, for directions to the Swansea branch of the bank. She was carrying two checks in her hand and showed Kennedy the Swansea address on the checks. Kennedy told her that there was no Boston Five branch in Swansea and he offered to help her.

After they entered the customer service area, Palhava told Kennedy that she wanted to have the two checks certified. He informed her that the Boston Five did not certify checks.

Palhava explained that she had flown from Brazil to New York that day and that her banker in New York, where she had an account, had told her that she would have to have the checks certified at the bank on which they were drawn in order to have the funds available to her during her visit in New York. She had, therefore, just flown to Boston to have the checks certified.[1] One check was payable to Palhava in the amount of $24,500 and the other check was payable to Dr. Hosmany Ramos in the amount of $9,500 and was endorsed over to Palhava.

Kennedy offered to issue Palhava a treasurer's check in exchange for the check which was payable to her directly if there were adequate funds in the account and if she had satisfactory identification. Palhava was concerned that the treasurer's check would not satisfy her banker in New York. When Kennedy reassured her that he would explain the situation to her New York banker if he were able to issue the treasurer's check, she agreed to have him go ahead with the procedure.

Kennedy then entered the check's account number into the bank's computer and found that there was a hold on the account. When he called George Garcia, whose signature appeared on the checks and who was the account holder, Kennedy learned that Garcia had had a checkbook stolen in Brazil while on vacation in April and that the check to Palhava was from the stolen checkbook. Garcia told Kennedy that he did not know Palhava or Dr. Hosmany Ramos. Palhava talked with Garcia on the telephone and told him that she had gotten the checks from her husband in Brazil and that she would have her husband call Gar-

cia and explain how he had gotten the checks.

While Palhava was talking to Garcia, Kennedy was talking by telephone to George Coleman, head of the bank's security department. In his conversation with Coleman, Kennedy told him that he had a woman by the name of Ana Palhava at the bank who had two checks, one for $24,500 and one for $9,500, which were drawn on the Boston Five account of George Garcia, that the checks appeared to be stolen, and that she was at that time on the telephone with Garcia. Coleman told Kennedy that he knew something about the situation with the Garcia account,[2] to stall Palhava at the bank if he could, and that he, Coleman, would be at the Tremont Street branch in about ten minutes.

When Coleman approached Kennedy and Palhava, Kennedy opened the gate to the customer service area and directed Coleman to Palhava who was sitting at Kennedy's desk. Coleman identified himself and Palhava remembers that he said that he could arrest her. Coleman then asked Palhava for her identification. Palhava showed him her Portuguese passport which Palhava says that Coleman kept and was not returned to her until after her criminal trial. Palhava also showed Coleman her airline ticket which had her return flight from New York to Brazil scheduled for about one week later. Coleman read Palhava her Miranda rights.

Coleman questioned Palhava about the checks. Palhava answered that her husband had given her the checks and that she did not know where he had gotten the checks. She also said that she did not know Dr. Hosmany Ramos, the endorser of one of the checks. Palhava explained to Coleman that her husband discussed the checks with the New York banker on the telephone and had been advised to have the checks certified in Boston. She suggested

---

1. There is some discrepancy between these facts and the deposition testimony of the plaintiff. In all material aspects, we have taken the facts in the light most favorable to the plaintiff.

2. Someone from Merrill-Lynch had called the Boston Five the day before to verify a check from the same account and the security department was notified that the stolen checks were in circulation.

that Coleman call her husband to get an explanation of the checks and she gave him the four-digit number for a local call in Sao Paulo, Brazil. Coleman did not call Palhava's husband.

Instead, Coleman called the Boston office of the F.B.I. and asked Kennedy to call the Boston Police Department and to tell the police that there was a person at the bank attempting to negotiate stolen checks. When Officers Martin and O'Malley of the Boston Police Department arrived at the bank, they talked with Coleman and then asked Palhava for her passport, looked at it and kept it. Martin, O'Malley and Coleman spoke by telephone with a superior officer at the police station.

Officers O'Malley and Martin transported Palhava to the police station where she was booked on charges of attempted larceny and uttering forged checks. The booking sheet and Incident Report listed Coleman as the arresting officer. Palhava was held on $50,000 bail and spent Friday night in jail. On Saturday, she was released into the custody of her lawyer. Coleman swore out complaints against Palhava for uttering and attempted larceny on Monday, May 18. On Friday, May 22, at the conclusion of her criminal trial, Palhava was acquitted of all charges.

Palhava and her husband, Sergio Varella-Cid filed this civil action against Coleman and the Boston Five on June 15, 1981. Late in June, Varella-Cid left their home in Sao Paulo, Brazil, and never returned. He is believed to have been murdered. Palhava left Brazil and moved to Portugal in July 1981. Palhava has continued the suit alone.

## II

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The party moving for summary judgment must show that there is no

genuine issue as to material facts. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 990–91 (1st Cir.1983). On appeal from summary judgment, we look at the record before the district court in the light most favorable to the nonmoving party, *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and resolve all inferences in favor of the nonmoving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Because "the purpose of summary judgment is not to explore all the factual ramifications of the case, but to determine whether such exploration is necessary," *Briggs v. Kerrigan,* 431 F.2d 967, 968 (1st Cir.1970), the party opposing summary judgment "may not rest upon mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Over The Road Drivers, Inc. v. Transport Ins. Co.,* 637 F.2d 816 (1st Cir.1980).

Although a court may not weigh the evidence or make credibility determinations in granting summary judgment, the court may end a suit before trial if the court determines that, taking the facts and reasonable inferences therefrom in the light most favorable to the non-moving party, no reasonable juror could find for that party.

*Taylor v. Gallagher,* 737 F.2d 134, 137 (1st Cir.1984).

In the present case, there is no genuine dispute as to the material facts leading up to Palhava's arrest. Although Palhava claims that the court below relied on unreasonable assumptions and additional immaterial facts to support summary judgment, we find no support for this claim in the district court's recitation of the facts.

We summarize the undisputed facts: Palhava requested certification of two checks which Coleman knew had been stolen. One check was made payable directly to Palhava and the other check was endorsed over to her. Palhava did not know the signer of

the checks nor did she know the endorser. She explained her possession of the checks by saying that her husband had given them to her and that she did not know how her husband happened to have them. She asked Coleman to call her husband in Brazil for a more complete explanation. Palhava told the defendants that she planned to return to New York that day and her airline ticket, which Coleman saw, showed that she planned to return to Brazil within a week.

The definition of probable cause in Massachusetts law is " 'such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain a strong suspicion, that the person arrested is guilty.' " *Muniz v. Mehlman*, 327 Mass. 353, 99 N.E.2d 37, 40–41 (1951) (quoting *Bacon v. Towne*, 4 Cush. 217, 238–9). Probable cause must be based on an objective test from the point of view of the "reasonable and prudent" person:

> [W]ould the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the action taken was appropriate? ... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

*Coblyn v. Kennedy's, Inc.*, 359 Mass. 319, 268 N.E.2d 860, 863 (1971) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–81, 20 L.Ed.2d 889). Probable cause does not, however, require the same quantum of evidence as does proof of the crime for conviction. *Commonwealth v. Andrews*, 358 Mass. 721, 267 N.E.2d 233, 235 (1971). To have probable cause to arrest for a felony, "it [is] enough if [the arresting officer] believed upon reasonable cause that the person being arrested had committed a felony." *Julian v. Randazzo*, 380 Mass. 391, 403 N.E.2d 931, 934 (1980); *see also Commonwealth v. Snow*, 363 Mass. 778, 298 N.E.2d 804, 811 (1973). The standards for probable cause are intended to strike a balance between competing societal interests:

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

Under Massachusetts law, "[t]he crime of uttering consists of four elements: (1) offering as genuine; (2) an instrument; (3) known to be forged; and (4) with the intent to defraud." *Commonwealth v. Levin*, 11 Mass.App. 482, 417 N.E.2d 440, 448 (1981), *aff'd*, 390 Mass. 857, 460 N.E.2d 578 (1984); Mass.Gen.Laws Ann. ch. 267, § 5 (West 1970). The elements of the crime of attempted larceny are: (1) an intent to commit a substantive crime; and (2) an actual attempt to commit the crime intended. *Commonwealth v. Burns*, 8 Mass.App. 194, 392 N.E.2d 865, 867–68 (1979); *Commonwealth v. Ware*, 5 Mass.App. 506, 364 N.E.2d 1080, 1081 (1977), *aff'd*, 375 Mass. 118, 375 N.E.2d 1183 (1978); Mass.Gen.Laws Ann. ch. 274, § 6 (West 1970). There is no dispute that Palhava offered two stolen and forged checks for certification and requesting certification under Massachusetts law is the same as presenting the checks for acceptance. Mass.Gen.Laws Ann. ch. 106, §§ 3–410, 3–411 and 3–504 (West 1970 and 1985 Supp.). The issue is

whether Coleman had probable cause to believe that Palhava knew the checks were stolen and forged when she asked to have them certified.

Massachusetts law recognizes a permissible inference of guilty knowledge "from the facts and circumstances, including the [plaintiff's] possession of recently stolen goods." *Commonwealth v. Burns*, 388 Mass. 178, 445 N.E.2d 613, 616 (1983). Before a jury may infer guilty knowledge, which is an essential element of the crime charged, the state must prove beyond a reasonable doubt that the goods in possession of the defendant were recently stolen and that the circumstances were inconsistent with an innocent explanation of possession. Because the inference is sufficient to allow a jury to find an essential element of a crime beyond a reasonable doubt, the inference would also allow an arresting officer to infer guilty knowledge sufficient for probable cause if the inference were supported by the facts and circumstances at the time of the arrest. *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 3.6 at 644 (1978).

Coleman knew before he arrested Palhava that the checks were stolen. He also knew that Garcia had not written or signed any checks to Palhava or to Dr. Hosmany Ramos. Because the checks were stolen in blank form without the account holder's (Garcia's) signature, knowledge that the checks were stolen would, in this case, mean knowledge that the checks were forged.

The parties dispute whether the checks which were stolen one month before the arrest fall within the meaning of "recently" stolen goods. "That decision must be made on the basis of the facts and circumstances of each case." *Commonwealth v. Sandler*, 368 Mass. 729, 335 N.E.2d 903, 913 (1975). Here, there was still a hold on the Garcia account and Coleman knew that there had been an inquiry about another of the stolen checks the day before. Those facts and circumstances suggest that the checks were still recently enough stolen to

reasonably arouse a suspicion concerning Palhava's possession of the checks.

The explanation which Palhava gave to Coleman for her possession of the checks was that her husband gave them to her to deposit in her New York bank account. She said that her New York banker had advised her husband to have the checks certified in Boston. Her explanation might satisfy Coleman as to why she sought certification for the checks in Boston but it does not reasonably explain how she happened to have two stolen checks in the first place. She told Coleman that she did not know either Garcia, whose signature appeared on both of the checks, nor Dr. Hosmay Ramos, the endorser on one of the checks, despite the fact that both of the checks were made payable to her. Her explanation that her husband gave them to her could still reasonably leave Coleman suspicious about her possession because the checks were made payable to her for no reason known to her and by people with whom she had had no contact. Therefore, Coleman could reasonably have concluded that she knew the checks were stolen before she presented them at the bank because her explanation of her possession of recently stolen checks was not plausible given the facts and circumstances of the situation.

When her explanation did not satisfy Coleman, Palhava suggested that he call her husband in Brazil for further explanations and she provided him with the four-digit local number in Sao Paulo, Brazil. In some circumstances, an arresting officer may have a duty to pursue further information if it is available and likely to be trustworthy. *See B.C.R. Transport Co. v. Fontaine*, 727 F.2d 7, 11 (1st Cir.1984). *But see Muniz v. Mehlman*, 327 Mass. 353, 99 N.E.2d 37, 41 (1951) (an arresting officer has a duty to determine whether there is probable cause to arrest but not to investigate the suspect's defense); and 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2, 466–68 (1978). In this situation, Coleman

could not reasonably be expected to call Palhava's husband in Brazil.[3]

In light of all the facts and circumstances undisputedly known to Coleman at the time he arrested Palhava, we hold that no reasonable jury could find that Coleman did not have probable cause to arrest. The district court's decision to grant summary judgment in favor of the defendants is *affirmed.*

---

**3.** The following is the explanation which Dr. Hosmany Ramos presented at Palhava's criminal trial as to how the stolen checks made their way into Palhava's possession. Our only comment is that it would be almost impossible to convey this information in a single telephone call.

Near the end of April 1981, in Rio de Janeiro, a mutual friend introduced Ramos to an American because Ramos had diamonds to sell. The American identified himself as George Garcia. Ramos met with "Garcia" four times in order to negotiate a deal for the sale of diamonds. Ramos understood that "Garcia" knew about diamonds because he wanted to see the diamonds on the top of a building in the daytime. They finally agreed on a price of about $35,000 and that "Garcia" would pay in American checks but Ramos wanted more time to think it over.

Three or four days later, Ramos met with Palhava's husband, Varella-Cid, because the man who was repairing Ramos' Mercedes told Ramos that Varella-Cid had a new Mercedes for sale. Varella-Cid asked $60,000 for his car. Ramos proposed to trade him his old Mercedes plus two diamonds which he had along with him plus $24,500. Mercedes are extremely expensive in Brazil due to the import duty. Ramos asked Varella-Cid if he would be willing to take the American checks instead of money and Varella-Cid agreed because of Palhava's account in the New York bank. They typed up an agreement and Ramos gave Varella-Cid the two diamonds.

Ramos returned to Rio to meet with "Garcia." "Garcia" asked if Ramos would like to have two checks rather than one and if he wanted them made out to a particular person or signed in blank. Ramos called Varella-Cid to find out what name to have "Garcia" put on the check and he instructed Ramos to have it made out to his wife, Ana Palhava. When the deal with "Garcia" was completed, Ramos received two checks: one for $24,500 made payable to Ana Palhava and signed by George Garcia, and one for $9,500 made payable to Ramos himself and also signed by George Garcia.

Now Ramos contacted Varella-Cid and agreed to meet him in Sao Paolo to finish the car sale. Varella-Cid met Ramos at the airport driving the Mercedes which was for sale. They stopped to get gas and then Varella-Cid suggested that they go to his house to get his other car before driving to the service station to pick up Ramos' old Mercedes. When Ramos saw that Varella-Cid's other car was a 1981 Porsche he decided he would rather buy that car and Varella-Cid agreed to sell it. They negotiated a price of $30,000 for the Porsche. The new deal was that Varella-Cid would get Ramos' old Mercedes plus about $10,000 and Ramos would get the Porsche. So, Palhava endorsed the check which had been made payable to her and gave it back to Ramos.

The next day Varella-Cid proposed a new deal. He would take both of the checks and keep one of the diamonds. Ramos would take back one of the diamonds and his old Mercedes and he would keep the Porsche but he could not have the title to it until the checks cleared because Varella-Cid wanted to see if the checks were good or not. Varella-Cid then sent Palhava to New York and Boston to have the two checks deposited in her New York bank account.