# IN RE APPEAL NO. 245, September Term, 1975
## from the Circuit Court for Kent County,
### sitting as a Juvenile Court

[No. 245, September Term, 1975.]

*Decided November 28, 1975.*

132

The cause was argued before ORTH, C. J., and POWERS and MASON, JJ.

*David B. Mitchell, Assigned Public Defender,* for appellant.

*Michael James Kelley, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Floyd L. Parks, State's Attorney for Kent County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

## STATEMENT OF THE CASE

On 6 February 1975 two petitions were filed in the Circuit Court for Kent County, sitting as a Juvenile Court, against appellant,[1] a youth then seventeen years of age. Both alleged

---

1. See Maryland Rule 1097 concerning confidentiality with respect to appeals from courts exercising juvenile jurisdiction.

that he was a delinquent child.[2] One gave as reason that on 9 July 1974 he had stolen a bike belonging to C. Daniel Saunders (Code, art. 27, § 340). The other gave as reasons that on 12 December 1974 he had (1) received a pair of binoculars belonging to George Outten, knowing them to have been stolen (Code, art. 27, § 467), and (2) stolen the binoculars (Code, art. 27, § 341). The petitioner in each petition was William T. Blackiston, Jr., Deputy Sheriff of Kent County. At an adjudicatory hearing which terminated on 3 March 1975, the court found under the petition concerning the binoculars that appellant was a delinquent child. It dismissed the petition concerning the bike. At a dispositional hearing on 20 March 1975 appellant was committed to the Secretary of Health and Mental Hygiene for placement at Maryland Training School. The Secretary was directed to provide psychiatric and psychological services. An appeal was noted.

## THE CONFESSION

### Background

At the adjudicatory hearing,[3] a confession obtained by the authorities from appellant was challenged. Evidence was received on the motion to suppress it. On 11 July 1974 Saunders reported the theft of his bike to the office of the

---

**2.** " 'Delinquent child' means a child who commits a delinquent act and who requires supervision, treatment, or rehabilitation." Courts Art. § 3-801 (k).

" 'Delinquent Act' means . . . an act which would be a crime if done by a person who is not a child." Courts Art. § 3-801 (j). See ch. 554, Acts 1975, effective 1 July 1975.

**3.** We note that in a delinquency hearing, pursuant to the Maryland Rules of Procedure in effect at the time of the hearing here, the State's attorney shall prepare and present the testimony in behalf of the petitioner unless excused by the court. Rule 912 b. The rules of evidence applicable to criminal cases shall apply. Rule 912 c. The alleged delinquent may remain silent as of right and shall be so advised. Rule 917. The allegations must be proved beyond a reasonable doubt, and an uncorroborated confession made by a child out of court is not sufficient proof of delinquency. Courts Art. § 3-830 (a). The Court of Appeals, by order dated 18 June 1975, approved and adopted, effective 1 July 1975, a revision of chapter 900, made necessary by an enactment of a new statewide Juvenile Code by ch. 554, Acts 1975, §§ 3-801 to 3-833 of the Courts Article, effective 1 July 1975.

134

Sheriff for Kent County. On 12 December 1975 Outten reported to that office that his home had been broken and entered and that personal property had been stolen. Blackiston and Deputy Sheriff Jess Metcalfe investigated the crimes. Their investigation led them to appellant, one of a group of suspects. On 18 January 1975, about 4:00 p.m., Blackiston and Metcalfe, in uniform and wearing side-arms, went in their official car to the trailer home where appellant lived with his parents. Appellant was the first "suspect" they went to see. Blackiston said: "I wasn't sure he was my man. I wanted to investigate to find out who was." The deputies told the parents they wanted to see appellant. Appellant appeared from within the trailer, and Blackiston took him to the car parked nearby to interrogate him. Blackiston testified that he did this "Because it's generally my policy to do an interrogation on my grounds."

Appellant was born in January 1958. At age 8 years and 10 months he was in the second grade in a school in Wilmington and was given an I.Q. test known as the WISC (Western Intelligence Scale for Children). His verbal score was 74, performance was 78 and full scale I.Q. was 73. The next year he was placed in the "Special and Emotionally Maladjusted" third grade class in a Kent County school. In 1968, 1969 and 1970 he was in primary "special education" at Millington. "Special education" was "a special placement in classes for children who cannot function or get along in a regular class for various reasons." In May 1971 he was again given the WISC test and also an achievement test known as WRAT. On the former his verbal score was 75, his performance quotient was 92 and his full scale I.Q. was 81. On the WRAT test his reading level was 3.9, spelling was 4.3 and arithmetic was 3.3. In 1971 he attended the sixth grade at Galena Middle School. He was present 66 days and absent 8 days. He withdrew and his records were sent to Chestertown Middle School on 3 January 1972, although it seems that he did not attend that school. On 14 February he was transferred to Cambridge State Hospital where he remained until 27 March 1974, when he was discharged to his parents. There were home visits, so that the actual time spent in that Institution

was about one year and four months.[4] The Institution's final diagnoses on discharge included "adjustment reaction of adolescence, conduct disturbance" and "borderline mental retardation with other (and unspecified) condition." [5] The condition on release and prognosis was, "Patient's condition on leaving was excellent from the physical and psychiatric viewpoint. However, prognosis is considered guarded if patient doesn't have enough supervision at home and if he doesn't have a job in the community." Appellant did not return to school. This was the background of the youth Blackiston took to the police car to interrogate.

## Circumstances Surrounding the Obtaining of the Confession

Blackiston sat in the front seat and placed appellant in the back seat. Blackiston testified that he read all the *Miranda* warnings to appellant and that appellant said he understood them. "And I said, 'Do you knowingly waive these rights?' and [appellant] didn't know what the words 'knowingly waive' meant, so I explained to him that if he wanted to talk to me about Mr. Outten's property he could stop any time and not tell me anything. And he advised me okay." There was evidence tending to show that the confession was voluntarily in the traditional sense. Blackiston said that neither he nor Metcalfe made any threats, gave any promises or extended any inducements to appellant to get him to talk. Metcalfe, who had remained at the trailer to talk to the parents, appeared about the time Blackiston finished giving the *Miranda* warnings and sat in the front

---

**4.** The court observed: "[T]he Court knows the circumstances of [appellant's] stay at the hospital. He was sent for evaluation and due to his getting lost by the Courts or by Juvenile Services, or by someone, and due to the staff at the hospital feeling that he needed treatment, they didn't submit a report to the Court, and continued to just keep him, that's all. What's the date? That's February of '72 I believe, and they didn't submit a report until July 26th, '72. And it refers to a conversation, and I am sure was the result of my conversation with Dr. English or Dr. Culloda, and I can't recall which now, it was agreed we let him stay there. So I say all of this for record purposes and so that things won't appear in a different light than the true light of this case. That's all."

**5.** There were two other diagnoses: "hypochromic anemia, treated", and "adolescent gynecomastia, etiology unknown."

seat next to Blackiston. The interrogation proceeded. Appellant gave a verbal statement.

Appellant's father gave his version of what occurred:

> "He drove up to the yard and my wife went to the door and said a Trooper car was here, and I said, 'What Trooper,' and she said, 'From Maryland.' Then they came up to the door and one had his hat on [apparently Blackiston] and the other one didn't. Before he knocked on the door she opened the door. And he said — I can't tell one from the other, but the one that had the hat on said, 'Could I talk to Stanford?', and she said, 'Come on in.' They came in and the short one, the one that didn't have the hat on, wasn't completely in the door. My wife called to [appellant], he was in the back, in the back bedroom and he came out of the trailer on the porch part. She said to him, 'They want to talk with you.' Then the one that had the hat on said, 'Boy, go to the car.' They went on to the car. Then the one that didn't have the hat on, he went out first. He was the last one getting in the car. I watched out the window."

He denied that the deputies told them why they wanted to talk to appellant.

Appellant told what occurred when the deputies arrived:

> "I was in the bedroom, in the back bedroom in the trailer, getting my shirt. Then my mother called me out there on the porch because the policemen was there. Then the young one, with the hat on, asked my father could he ask me some questions. The one in the doorway didn't say anything. Then we went out into the car and that was when he started asking me questions."

According to appellant, he, Blackiston and Metcalfe went out to the car at the same time. Metcalfe said, addressing appellant by his first name, "_____, we've got some trouble around here and I think you know about it." Then

Blackiston "started reading off my rights." Appellant denied, however, that anything was said about a lawyer. He said he went with the "policemen" because he was afraid they would take him to Chestertown and lock him up.[6] On cross-examination the State pursued the matter of the voluntariness of the statement in the traditional sense:

"Q. Now, did they ever threaten to hit you?
A. No sir.
Q. Or beat you?
A. No sir.
Q. Did they make any promises or do anything to you that was bad?
A. No sir."

Blackiston was recalled by the State. He said that when he and appellant went to the car, Metcalfe remained at the trailer to talk to the parents. About ten or fifteen minutes elapsed before Metcalfe came to the car. Blackiston said that when he and appellant first arrived at the car "I introduced myself and advised [appellant] that I wanted to talk to him about George Outten's home being broken into and some things being taken." Blackiston iterated that he then gave the *Miranda* warnings, and that appellant said he understood them and waived them. On cross-examination, asked why he did not talk to appellant in the trailer about the Outten matter, Blackiston replied: "I do it differently at times, but I generally take the people out in the car to talk." He said he tried "to deal with" both adults and juveniles the same way.

6. The judge inquired about this statement. The transcript reads:
"Judge Rasin: Why do you think they were going to do that? Do you think a policeman, every time you see one, is going to lock you up?
A. They seem to aways have some reason.
Judge Rasin: Do you mean whenever a policeman sees you he seems to have some reason to lock you up?
A. Around here."

138

*Admissibility of the Confession*

The judge below granted the motion to suppress the confession. Upon our independent constitutional appraisal, see *Davis v. North Carolina*, 384 U. S. 737, 741-742 (1966), we think it was properly excluded. We reach this conclusion for alternative reasons. The confession was inadmissible both because an effective waiver of the privilege against self-incrimination and the right to retained or appointed counsel was not shown, and because it was the fruit of a poisonous tree.

The judge below apparently relied on the failure to show a valid waiver of the constitutional privilege against self-incrimination and right to counsel in holding that the confession was to be excluded. We are in accord. The rule of *Miranda v. Arizona*, 384 U. S. 436 (1966) is that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.*, at 444. It is manifest that the statement here was obtained during a custodial interrogation. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The Court noted, at 444, n. 4: "This is what we meant in *Escobedo [v. Illinois*, 378 U. S. 478 (1964)] when we spoke of an investigation which had focused on an accused." See *Myers v. State*, 3 Md. App. 534 (1968); *Duckett v. State*, 3 Md. App. 563 (1968). Effectuation of the *Miranda* rights may be waived "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, at 444. "After such warnings have been given, and such opportunity [to exercise the rights] afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.*, at 479. "If the interrogation continues

without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . . This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." 384 U. S., at 475. "Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." Id., at 476. Although "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver," id., at 475, we believe that the State did not meet its heavy burden to demonstrate that appellant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. In reaching this determination, we have considered the background of appellant, his mental capacity, his education, the separation from his parents in order to interrogate him, the place of interrogation and its conduct by two armed officers. The "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and do not presume acquiesence in their loss. *Johnson v. Zerbst, supra,* at 464. In short, upon the particular facts and circumstances surrounding this case, including the background, experience and conduct of appellant, we cannot say that appellant, in the constitutional sense, intelligently relinquished or abandoned his known rights or privileges.

The alternative reason why we think the confession here was inadmissible requires a look at the doctrine of the fruit of the poisonous tree as it applies in Maryland.

On 14 January 1963 the Supreme Court of the United States decided *Wong Sun v. United States*, 371 U. S. 471. Nearly half a century before, the Court held that evidence seized during a search unlawful under the Fourth Amendment could not constitute proof against the victim of the search. *Weeks v. United States*, 232 U. S. 383 (1914). The exclusionary prohibition extended as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co. v. United States*, 251 U. S. 385 (1920). The exclusionary rule had traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It followed from the Court's holding in *Silverman v. United States*, 365 U. S. 505 (1961), that the Fourth Amendment may protect against the overhearing of verbal statements as well as the more traditional seizure of tangible evidence. Thus, verbal evidence which derived so immediately from an unlawful entry and an unauthorized detention may be no less the "fruit" of official illegality than the more common tangible fruits of an unwarranted intrusion. That is, the policies underlying the exclusionary rule do not invite any logical distinction between physical and verbal evidence. *Wong Sun*, 371 U. S., at 486.[7] The fruit of the poisonous tree doctrine may not be applicable where the prosecution has learned of the evidence from an independent source or where the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint. The Court said, *id.*, at 487-488:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police.

---

**7.** The Court said in *Wong Sun*, at 486: "Either in terms of deterring lawless conduct by federal officers, . . . or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, . . . the danger in relaxing the exclusionary rules in the case of verbal evidence would seem too great to warrant introducing such a distinction."

Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

Although the Fourth Amendment was held to apply to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U. S. 643 (1961), the Court of Appeals of Maryland promptly expressed the belief that *Wong Sun* was not intended to, and did not control state prosecutions. As far as this State was concerned, *Wong Sun* was buried. When original appellate jurisdiction in criminal causes devolved on the Court of Special Appeals, it followed the lead of the Court of Appeals. For twelve years, those accused and convicted of crimes endeavored from time to time to resurrect *Wong Sun*, but their attempts were firmly rejected by the appellate courts of Maryland, which steadfastly adhered to the view that *Wong Sun* did not apply. See cases cited in Ryon v. State, 29 Md. App. 62, n. 13 at 73-75 (1975). In *Carter v. State*, 274 Md. 411, n. 9 at 431-432, decided 11 April 1975, the Court of Appeals indicated some doubt as to its holdings with respect to *Wong Sun*, but left for another time the question of their continuing viability. That time came three days later when *Everhart v. State*, 274 Md. 459, was decided. Characterizing as "dicta" the prior declarations that *Wong Sun* "involved a federal prosecution, not a state one", and that *Wong Sun* was "not intended to, and does not control prosecutions in state courts", and noting that "such statements would now appear to have been erroneously gratuitous observations", *id.*, n. 4, at 478-480, the Court exhumed *Wong Sun*. It applied the *Wong Sun* rationale in holding that when information serving as a basis for probable cause was obtained or derived as a result of an illegal search and seizure, the doctrine of the "fruit of the poisonous tree" applies to preclude the use of such information as the basis for a search warrant. *Id.*, at 478-482.[8]

---

8. The Court said, 274 Md. at 481-482: "The doctrine of the 'fruit of the

It now appears that the Supreme Court always deemed *Wong Sun* controlling in state prosecutions. On 26 June 1975 it decided *Brown v. Illinois*, 95 S. Ct. 2254, and the decision was firmly bottomed on *Wong Sun*. In applying the *Wong Sun* holdings to determine the validity of a conviction obtained in a criminal prosecution by the State of Illinois, the Court simply assumed without question that *Wong Sun* controlled. If this left any doubts as to the status of *Wong Sun* in Maryland criminal prosecutions, they were swiftly resolved. On 30 June 1975 the Supreme Court granted certiorari in the case of *Ryon v. Maryland*, 95 S. Ct. 2674. Minnie Sue Ryon had been tried in the Circuit Court for Harford County, convicted of murder in the first degree, and sentenced to life imprisonment. We affirmed the judgment on direct appeal, holding that *Wong Sun* did not apply to exclude a confession obtained from Mrs. Ryon. *Ryon v. State*, No. 376, September Term, 1973, filed 11 June 1974, unreported. The Court of Appeals denied certiorari, 272 Md. 747 (1974). The Supreme Court vacated the judgment of the Court of Special Appeals and remanded the cause to that Court "for further consideration in light of *Brown v. Illinois*." Complying with this mandate, we applied the *Wong Sun* teachings, reversed the judgment below because Mrs. Ryon's confession was the fruit of the illegal arrest of her, and thus, was admitted in evidence in error, and remanded the case for a new trial. *Ryon v. State*, 29 Md. App. 62 (1975). It is clear that the *Wong Sun* doctrine is now the law of this State.[9]

---

poisonous tree' extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search; in its broadest sense it prohibits the prosecution from using in any manner, prejudicial to the accused, information derived from facts learned as a result of the unlawful acts of law enforcement agents."

9. Neither Brown v. Illinois, *supra*, nor Everhart v. State, *supra* mentioned the question of retroactive application of their respective decisions. It is manifest, however, from the mandate of the Supreme Court to us in Ryon, that *Brown* is to apply, at the least, to cases not finally litigated at the time of the *Brown* decision. We said in Greene v. State, 11 Md. App. 106, n. 1, at 111 (1971), that a case is finally litigated when the time for direct appeal expires without an appeal having been taken, or if an appeal has been made, the date on which certiorari was denied by the Supreme Court of the United States, or the time to apply for certiorari has expired without application having been made.

We have indicated that the confession was obtained from appellant during a "custodial interrogation" of him within the contemplation of *Miranda*. We think also that appellant was in custody at the time within the contemplation of *Wong Sun*. When Blackiston took appellant to the car and placed him in the back seat in order to interrogate him, appellant was deprived of his freedom of action in a significant way and was, in fact, being detained. We do not think that a full-fledged arrest is a prerequisite of the application of the *Wong Sun* doctrine. Cf. *Morales v. New York*, 396 U. S. 102, 105-106 (1969). The question is whether the detention was illegal. We believe it was.

Courts Art. § 3-821, as in effect on 18 January 1975, provided:

"A child may be taken into custody:

(1) Pursuant to the order of the court under the provisions of this subtitle;

(2) Pursuant to the law of arrest;

(3) By a law enforcement officer or other person authorized by the court when he has reasonable grounds to believe that the child is in immediate danger from his surroundings and that his removal is necessary for his protection; or

(4) By a law enforcement officer or other person authorized by the court when he has reasonable grounds to believe that the child has run away from his parents, guardian, or legal custodian."

It is clear that appellant was not taken into custody under (1), (3) or (4) of the statute. Nor is there any indication that a warrant had been issued for his arrest. Further, the record does not reflect that the deputies had probable cause for a warrantless arrest. Blackiston said that after a report of the crimes had been received from the victims, an investigation was made, after which he and Metcalfe went to talk to appellant. Asked if he went to appellant's home "for the possibility of having him confess to the crime of B & E's around in that area", Blackiston said, "Not at first. I went

there to investigate a crime that took place and wanted to know what he knew about it. I never know whether they will confess or not." [10] Metcalfe said they "had reason to think" appellant was involved in the breaking of the Outten home and that they "understood" that appellant "had been riding around Golts" (the place where appellant lived), on a bike similar to the stolen one. This, absent further explanation, is obviously so insufficient to constitute probable cause for an arrest that discussion is unwarranted.[11] See *Stanley v. State*, 19 Md. App. 507 (1974), *cert. den.*, 271 Md. 745; *Hearsay and Probable Cause: An Aguilar and Spinelli Primer*, by Judge Moylan of this Court, 25 Mercer L. Rev. 741 (1974). Nor can we find from the record before us that appellant waived his right not to be taken into custody except upon legal grounds. If he freely and voluntarily went to the car with Blackiston and effectively consented to enter and remain therein to be questioned, the burden was on the State to so establish. The record does not show, in the circumstances here, that the State met this burden. We conclude that the detention of appellant, prior to and during the interrogation of him, was unauthorized.

Having found that the detention of appellant was illegal, we consider next the effect of this illegal conduct by the authorities on the admissibility of the confession. In *Ryon secundus* we found from *Wong Sun* and the cases related thereto, that statements obtained following an illegal detention were not rendered inadmissible simply because of that illegality, nor were they rendered admissible simply because the *Miranda* warnings were fully given. 29 Md. App. 62 at 71. Admissibility of such statements, *vel non*, must be answered on the facts of each case, upon consideration of:

   (a) the voluntariness of the statement, which is a
         threshold requirement;

---

**10.** In Brown v. Illinois, supra, at 2262, the Court noted the impropriety of an arrest "for investigation" or for "questioning."

**11.** Mere suspicion is not the equivalent of sufficient probable cause. Henry v. United States, 361 U. S. 98, 101 (1959).

(b) compliance with the *Miranda* safeguards, which is as important in determining whether the statements were obtained by exploitation of the illegal conduct;

(c) other relevant factors, such as

(i) the temporal proximity of the detention and the confession;

(ii) the presence of intervening circumstances;

(iii) the purpose and flagrancy of the official misconduct.

In the context of this second reason why the confession was inadmissible, that it was the fruit of a poisonous tree, we assume, for the purpose of decision that the statement was voluntary, and that there was full compliance with the *Miranda* safeguards. We, therefore, look to the other relevant factors. The confession followed close upon the heels of the illegal detention; there was no significant time lapse. There were no circumstances intervening between detention and the confession. The admitted purpose of the detention was to interrogate and the taking of appellant to the car from his home and the presence of his parents was patently flagrant, the admitted purpose being so the interrogation of appellant could be on Blackiston's own grounds. Thus, the confession was come at by exploitation of the illegality of the detention and not by means sufficiently distinguishable to be purged of the primary taint. Therefore, the confession was inadmissible.

## THE TANGIBLE EVIDENCE

Immediately after obtaining a statement from appellant in the car, the deputies and appellant returned to the trailer. Blackiston asked the parents whether they had seen appellant with a pair of binoculars. The father replied that he had seen binoculars in appellant's possession "the other day" and said to appellant, "Boy, ya tell the man where ya have them if you got it around here." Blackiston's version of what happened next was that appellant fetched the binoculars from somewhere in the trailer. The father's

version as given at the hearing was that appellant's mother found the binoculars and gave them to the police. On the record before us, it appeared that the inquiry about the binoculars stemmed from appellant's statement to the deputies. That is, from the record, we can only conclude that the deputies were led to the binoculars by what appellant told them. There was no evidence sufficient to establish that the deputies learned of the binoculars from a source independent of the confession. Blackiston testified that Outten made a complaint but the records regarding it were not produced. He also said that Outten told them what had been stolen, and that Metcalfe made a list of the articles as described by Outten, but the record is completely silent as to what articles were listed. The record just does not disclose that the authorities knew that binoculars had been stolen from Outten or that they had reason to believe that they were in the possession of the appellant, one of a number of suspects, until they obtained the confession. The deputies did not inquire about or seek the binoculars until they interrogated appellant but they did make inquiry and seek them immediately thereafter. The short of it is that, on the evidence, the binoculars were obtained through the confession and were a fruit of it. There was a causal connection between the confession and the tangible evidence which was not broken.

## QUESTION FOR DECISION

The question for decision on this appeal is whether, upon proper identification, the binoculars were admissible in evidence at the adjudicatory state of the delinquency hearing.

## DECISION

The court below, not having the benefit of *Brown, Everhart* or our second *Ryon* opinion, admitted the binoculars in evidence over objection, stating, "It seems to me that based on the testimony thus far that these have come into the hands of the police without any violations of

anybody's constitutional rights." [12] *Wong Sun* and its progeny teach us to the contrary.

## I

We look first at the admissibility of the binoculars in the frame of reference of the primary illegality being an unauthorized detention. When official misconduct resulting in the primary taint is an unreasonable search and seizure or an illegal arrest or an unauthorized detention, the Fourth Amendment is invoked. Violation of the Fourth Amendment right brings into play the exclusionary rule. The exclusionary rule applies to render inadmissible both tangible evidence and testimonial evidence derived from the official misconduct and tainted thereby.

In the case *sub judice*, granting the primary illegality, namely, that the detention of appellant was unauthorized, it followed that not only the subsequent confession was illegal, as we have indicated, but also that the binoculars improperly came into the possession of the deputies. The testimonial evidence derived from the detention, and the tangible evidence derived from the testimonial evidence. In other words, the detention led to the confession and the confession led to the binoculars. Each was the immediate, direct and proximate cause of the other with no break in the causal connection by time or circumstances. The primary taint flowed down to the confession and from it to the binoculars. The State did not establish that the binoculars were come at by means sufficiently distinguishable to be purged of the primary taint. Under the *Wong Sun* doctrine, the binoculars were inadmissible in the hearing on the delinquency of appellant, and we so hold.

## II

We next look at the admissibility of the binoculars in the frame of reference of the primary illegality being the

---

12. The court admitted the binoculars "subject to exception. . . . We will see what the defense has to say about them." The binoculars remained in evidence.

obtaining of the confession from appellant. As we have indicated, an alternative reason why the confession was inadmissible was that it was obtained without an effective waiver of the *Miranda* rights. This official misconduct invoked the Fifth Amendment. The question is whether the *Wong Sun* doctrine applies when the primary illegality is a violation of the Fifth Amendment privilege against self-incrimination. The State argues strongly that it does not. It points out: "In *Carter* and *Everhart,* the Court of Appeals had adopted the 'fruit of the poisonous tree' analogy in the context of illegal searches and seizures." It asserts: "No decision in this State, however, has mandated the application of that doctrine where the poisonous tree has Fifth Amendment roots." [13] It cites and quotes from George, *The Fruits of Miranda: Scope of the Exclusionary Rule,* 39 Colo.L.Rev. 478 (1967). Professor George, who believed that "to exclude derivative evidence on the strength of *Miranda* is to push the decision to its outer limits." *Id.,* at 489-491. He would not exclude any evidence discovered as the result of a coerced confession. The State quotes in J. Cook, *Constitutional Rights of the Accused — Trial Rights,* § 97 at 362 (1974), entitled "Fruits of an illegal confession":

> "Once it is determined that a statement was improperly obtained from an accused, it follows that any other evidence obtained as a result of the illegality is equally inadmissible. Thus, a confession ostensibly valid may be inadmissible by virtue of the taint of a previously improperly obtained confession."

It answers this assertion by observing that "[n]early all the cases cited by Cook to support his position, however, involve subsequent confessions tainted by previous improperly obtained confessions. Only a few involve the exclusion of tangible evidence the existence of which was uncovered through an illegal interrogation." We are not persuaded to adopt the State's view.

---

**13.** Of course, as we have indicated, it has been only a few months since it was recognized in this jurisdiction that *Wong Sun* applies in state prosecutions.

*Miranda*, at 479, declared flatly that until its required warnings and waiver are demonstrated by the prosecution at trial, "no evidence obtained as a result of interrogation can be used against him." It warned, *id.*, n. 48, at 479: "In accordance with our holdings today and in Escobedo v. State of Illinois, 378 U. S. 478, 492, 84 S. Ct. 1758, 1765; Crooker v. State of California, 357 U. S. 433, 78 S. Ct. 1287, 2 L.Ed.2d 1448 (1958) and Cicenia v. LaGay, 357 U. S. 504, 78 S. Ct. 1297, 2 L.Ed.2d 1523 (1958) are not to be followed." In *Harris v. New York*, 401 U. S. 222 (1971), the Court retreated somewhat from this position. Concluding that statements of the accused, taken without informing him of his right of access to appointed counsel, could be used to impeach the direct testimony of the accused at trial, the Court observed, at 224:

> "Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. ... It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

Then in *Michigan v. Tucker*, 94 S. Ct. 2357 (1974), the Court held admissible the testimony of a witness whom the police discovered as a result of the defendant's statements which were excluded because in giving the *Miranda* warnings the police omitted the one that the defendant had the right to free counsel if he could not afford to hire counsel.[14] In both *Harris* and *Tucker*, the misconduct of the police violated only the prophylactic rules developed by *Miranda* to protect the right against self-incrimination. *Tucker* at 2361 and

---

14. The defendant's interrogation took place prior to *Miranda* but his trial was afterwards. Therefore, *Miranda* applied. Johnson v. New Jersey, 384 U. S. 719 (1966).

2367. Thus, the exclusionary rule did not apply because its deterrent purpose necessarily assumes that the police have engaged in wilful, or at the very least, negligent conduct which has deprived the defendant of some right. "Where the official action was pursued in complete good faith, however [as it was in *Tucker*], the deterrence rationale loses much of its force." *Id.*, at 2365. In the instant case, we do not have official action pursued in compete good faith, with the confession rendered inadmissible by the mere inadvertent omission of one of the prophylactic *Miranda* warnings. We have the confession being obtained in the absence of an effective waiver of the constitutional rights relating to self-incrimination and assistance of counsel to which appellant was entitled.[15] The rationale of the holdings in *Harris* and *Tucker* does not apply to make admissible the tangible evidence obtained here, any more than it would apply to make admissible evidence derived from a confession not voluntary in the traditional sense.[16]

Far from limiting the *Wong Sun* doctrine to Fourth Amendment violations, *Tucker* expressly invited the application of that doctrine to Fifth Amendment violations in a proper case. The Court, 94 S. Ct. at 2365, quoted what it said in *United States v. Calandra*, 414 U. S. 338 (1974) about the exclusionary rule. Its prime purpose, said *Calandra*, at 347, "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." It continued:

" 'The rule is calculated to prevent, not to repair.

---

**15.** The Supreme Court rejected a suggestion "that courts should exclude evidence derived from 'lawless invasions of the constitutional rights of citizens' ", Terry v. Ohio, 392 U. S. 1, 13 (1968), in recognition of "the imperative of judicial integrity." Elkins v. United States, 364 U. S. 206, 222. It said, *Tucker*, at 2367, n. 25: "This rationale, however, is really an assimilation of the more specific rationales discussed in the text of this opinion, and does not in their absence provide an independent basis for excluding challenged evidence."

**16.** It would be absurd to suggest that the authorities could obtain a confession by torture and have evidence derived therefrom admissible at trial. The Court noted in *Tucker*, n. 23, at 2366: "Although completely voluntary confessions may, in many cases, advance the cause of justice and rehabilitation, coerced confessions, by their nature, cannot serve the same ends."

Its purpose is to deter — to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.' Elkins v. United States, 364 U. S. 206, 217, 80 S. Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)."

Then the Court in *Tucker* declared, at 2365:

"In a proper case this rationale would seem applicable to the Fifth Amendment context as well."

We think the case before us is such a proper case.

The weight of authority in other jurisdictions considering the admissibility of tangible evidence derived from statements unlawfully obtained is that such evidence is not admissible. *People v. Paulin*, 306 N.Y.S.2d 929, 934 (Ct. App. N.Y. 1969), held that tangible evidence seized as a result of suppressed statements to the police was properly excluded. The court in *People v. Peacock*, 287 N.Y.S.2d 166 (S.Ct. A.D. 1968), said, at 168: "If, indeed, defendant's admissions were the source of the proof against him, we would hold, consistent with the *rationale* in the cases relating to the use of evidence proceeding from an illegal search and seizure, that the fruits of the unlawful conduct in eliciting the admissions without the mandated warnings were equally excluded." *State v. Mitchell*, 155 S.E.2d 96, 99 (N. C. 1967) held that the trial court should have excluded evidence relating to where the police found a pocketbook "because they found it in consequence of the incompetent statement," citing *Wong Sun*, *Silverthorne*, and *Walder v. United States*, 347 U. S. 62 (1954). In *Commonwealth v. Leaming*, 247 A. 2d 590 (Pa. 1968), in a homicide prosecution, the location of the victim's body was a direct result of an admission given by the accused to the police. The admission was found to be inadmissible at the trial. The court said, at 594: "Thus, . . . the evidence concerning the finding of the victim's remains and all evidence pertaining to the body itself was constitutionally inadmissible against him at trial." [17] *Noble*

---

17. The court observed that it was unlikely that the body would have

*v. State*, 478 S.W.2d 83 (Texas, 1972) found that tangible evidence was the result of a custodial interrogation at a time when the accused had not been properly warned. It held that the evidence was inadmissible as the fruit of the poisonous tree, there being no showing that "these items would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint." *Id.*, at 84. The court in *United States v. Cassell*, 452 F. 2d 533, 541, (7th Cir. 1971), holding that a statement was inadmissible, held "also that the handwriting exemplar obtained by the agents following the admission also was inadmissible as 'fruit of the poisonous tree.'"

In *United States v. Castellana*, 488 F. 2d 65, 67, (5th Cir. 1974), the court determined that the accused's statements were illegally elicited. The question then was . whether tangible evidence should be excluded as derivatives of the accused's unlawfully elicited responses. It held, at 68: "Since we have found that [the F.B.I. Agent's] questions constituted unlawful custodial interrogation, and the handguns were the products of those questions, [the accused's] statements and guns must be excluded from evidence.[18] *Parker v. Estelle*, 498 F. 2d 625 (1974), was decided by the United States Court of Appeals for the Fifth Circuit between the time of the original *Castellana* opinion and the rehearing. The court said, at 629, "There can be no doubt that the *Silverthorne* principle, announced in a search and seizure context, is applicable to a suppressed confession case. . . ." It noted, at 629, n. 11, what *Silverthorne* said was the policy behind the rule: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before

---

been found without the aid of the accused. It was in a deeply wooded area removed from civilization and the police had no other evidence to connect the accused with the body other than his statements.

**18.** Upon rehearing en banc, the opinion was modified. A majority of the court opined that the Agent had a right to ask about guns as a "minimally offensive security measure in the line of Terry v. Ohio, 392 U. S. 1 (1968)" but that the inquiry about the source of the guns fell outside the rationale of the inquiry, "and that inquiry, as well as [the accused's] answer to it were properly suppressed." United States v. Castellana, 500 F. 2d 325, 326-327 (5th Cir. 1974).

the Court but that it shall not be used at all. 251 U. S. at 392, 40 S. Ct. at 183, 64 L.Ed. at 321." [19]

We hold that, on the record before us, the admission of the binoculars in evidence at the adjudicatory hearing was error requiring reversal of the judgment. We reverse it, and grant a new trial.

In view of our holding, we do not reach appellant's second question concerning the sufficiency of the evidence.

*Judgment reversed; case remanded for a new trial.*

---

**19.** The court in People v. Robinson, 210 N.W.2d 372 (Mich. 1974), excluded tangible evidence secured as a result of the accused's involuntary statements but not on the ground that there is a Fifth Amendment branch of the fruit of the poisonous tree doctrine. It believed that such a branch was "always present as an essential element of the Fifth Amendment guarantee." *Id.,* at 376. "While the exclusionary rule grew and developed as a necessary, but nevertheless extrinsic, adjunct to the Fourth Amendment, it has always been an intrinsic part of the Fifth Amendment." *Id.,* at 374. It construed the Supreme Court as holding, in its first opportunity to rule on the issue, "that evidence, primary or derivative, obtained in violation of the Fifth Amendment was inadmissible at a subsequent prosecution " 210 N.W.2d at 375. *Robinson* relied also on Kastigar v. United States, 406 U. S. 441, 444-445 (1972), emphasizing the statement that the privilege against self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Robinson concluded, at 376: "Upon [the accused's] trial, the prosecution will have the affirmative burden of demonstrating that all evidence which it seeks to introduce was in fact developed from a source wholly independent of defendant's involuntary statements. Any other holding would be contrary to the clear meaning given to the Fifth Amendment by the United States Supreme Court."

*Robinson* observed that the defendant was erroneous in his reasoning that there was a Fifth Amendment branch to the fruit of the poisonous tree doctrine and noted that he was "in good company," referring to People v. Tucker, 19 Mich. App. 320, aff'd, 385 Mich. 594 (1971), writ of habeas corpus granted, Tucker v. Johnson, 352 F. Supp. 266 (E.D., Mich 1972). 210 N.W.2d at 376, n. 1. When *Tucker* reached the Supreme Court, Michigan v. Tucker, *supra,* it would seem that the Court had an opportunity to adopt the *Robinson* view. *Robinson* was not discussed.