COMMONWEALTH *vs.* GORDON F. HAAS.

Essex.    March 7, 1977. — November 1, 1977.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Arrest. Evidence,* Admissions and confessions, Expert witness. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Probable cause. *Probable Cause. Waiver. Practice, Criminal,* Argument by prosecutor. *Witness,* Expert: opinion.

At a voir dire hearing prior to the trial of a defendant charged with murdering his wife and children, evidence that the defendant was barred by police from entering his home after the bodies were discovered, that he was taken to a police station where he was informed for the first time that his family had "expired," and that he was then asked, as instructed by the chief of police, what time he had left his home that morning, required a finding that the defendant had been subjected to a "custodial interrogation" which should have been preceded by Miranda warnings. [549-554] BRAUCHER, J., concurring.

Statements made by a criminal defendant subsequent to his receipt of Miranda warnings followed so closely upon illegal interrogation of him that their suppression was required. [554-556] BRAUCHER, J., concurring.

At a murder trial, where it appeared that, absent information illegally obtained, the police did not have probable cause to arrest the defendant for murder, his motion to suppress certain notes which were seized from him at the time of his arrest should have been granted [556]; BRAUCHER, J., concurring; HENNESSEY, C.J., dissenting; however, photographs of the defendant made after his arrest illustrating the scratch marks visible on his face were admissible since they would have been discovered without exploitation of the "primary illegality" [556].

At a criminal trial, failure of defense counsel to object to certain remarks by the prosecutor in his closing argument did not preclude appellate consideration of the claimed error where defense counsel requested a curative instruction at the conclusion of closing argument. [558-559]

Comments by a prosecutor in his closing argument which invited the jurors to draw an adverse inference from the defendant's failure to deny his guilt voluntarily were improper even though defense counsel had improperly urged the jury to draw a favorable inference from the defendant's failure to request an attorney after being informed by the police of his right to do so. [558-562]

At a murder trial, the judge did not err in denying the defendant's motion for a bifurcated trial, requesting an initial trial on the merits,

and, if found guilty, an additional hearing on the issue of criminal responsibility. [562]

At a murder trial, the judge did not err in qualifying a medical examiner as an expert to testify regarding the victims' time of death; nor was the examiner's testimony inadmissible on the ground that the Commonwealth failed to demonstrate that there exists a developed and reliable field of knowledge on which the examiner could draw; nor was his testimony inadmissible on the ground that it was formulated at the scene without the benefit of scientific testing. [562-564]

INDICTMENTS found and returned in the Superior Court on September 12, 1973.

Motions to suppress evidence were heard by *Donahue, J.*, and the cases were tried before him.

*David G. Hanrahan (John S. Leonard* with him) for the defendant.

*John C. Doherty,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree of his pregnant wife and two young children, Gordon F. Haas (Haas) appeals to this court pursuant to G. L. c. 278, §§ 33A-33H. Although Haas argues numerous assignments of error, we concern ourselves primarily with two of the grounds asserted as error: (1) the denial of three motions to suppress evidence, and (2) prosecutorial comment on Haas' failure to deny committing the crimes. We reverse the convictions and remand for a new trial. We also consider those evidentiary issues likely to recur in a new trial.

The basic facts, which are not in dispute, may be summarized as follows. Gordon F. Haas, a Williams College graduate, and his wife, Shirley, were married in 1965. In 1969, their first child, a son, was born. Approximately twenty-one months later a second child, a daughter, was born. During this period Haas commenced working for Lechmere Sales, and the family moved into a single-family home in Ipswich, Massachusetts. In June, 1973, Haas was still employed at Lechmere Sales, and the family lived in their Ipswich home. Mrs. Haas was pregnant.

On June 26, 1973, Haas arrived at Lechmere Sales in Cambridge at 7:30 A.M. He performed his job that morning

in what appeared to be a normal manner. A fellow employee observed some scratches on the right side of Haas' face. Haas said, "I leaned over to kiss Shirley and she must have been having a nightmare or something and she scratched me."

About 10:15 A.M., Robert Christensen, a friend and co-worker, entered the defendant's office and observed the defendant hanging up the telephone. The defendant then called the Ipswich police station and spoke to the desk officer. He stated that he had just received an anonymous telephone call to the effect that "black and white don't mix" and that his family had just been "taken care of."[1] He requested that an officer check on the welfare of his family and left a telephone number at which he could be reached.

An Ipswich police officer was dispatched to the Haas home to investigate. He found the front door ajar with a key in the lock. After calling out and receiving no response, the officer entered the house and discovered the bodies of Mrs. Haas and the children in their beds in separate bedrooms. Each victim's head was covered with a white plastic bag tightly secured with adhesive tape.[2]

The investigating officer radioed for an ambulance and for additional assistance. State and local police officers, including the Ipswich chief of police and a medical examiner, converged on the scene. An investigation commenced. The house was observed to be in order, the windows appeared to be secure, and the backyard, which was muddy, contained no footprints. The only sign of any physical disturbance was in the master bedroom (the location of Mrs. Haas' body) where the sheets were off the bed. In that room a sign which read "[b]lack and white don't mix" was found.

The medical examiner examined the bodies and informed

---

[1] The Haases were an interracial couple; he was white; she was black.

[2] There was conflicting testimony by medical experts as to the exact time of death. However, it is undisputed that the deaths occurred in the morning hours of June 26.

the chief of police that each victim died between 3 and 5 A.M. He also noted that the fingernail on the middle finger of Mrs. Haas' right hand was broken.

The police did not return Haas' call, and sometime after the discovery, Haas again called the police station. Haas was told to come home but was not told what the police had found.

After learning of the medical examiner's opinion as to the estimated time of death, the chief instructed his men not to let the defendant in the house when he arrived home; instead, they were told to take the defendant to the police station, inform him of the deaths, and ask him what time he left for work that morning. Approximately thirty to forty-five minutes later, the defendant arrived at his house in a car driven by Christensen. After Haas got out of the car, he was met by one of the members of the Ipswich police, Officer Rauscher, with whom he had a brief conversation.[3] Haas then got in the back seat of a police car. Christensen, Officer Rauscher, and Officer Surpitski, an inspector for the Ipswich police department, also got in the car. The defendant was driven to the police station, where the four men went into the inspector's room. At this time, Haas was first advised of the deaths of his entire family. Moments thereafter, Haas was asked what time he left for work. Haas replied, "I want to be helpful. I left between 6:15 and 6:30."

After calling the chief, the officers placed the defendant under arrest and read him his Miranda rights. Haas signed a waiver of rights form, and then responded to further questions. Haas told the officers he arrived home at approximately 11:15 the previous evening. His wife arrived home at approximately the same time, and that after chatting they went to bed. Haas said he and his wife had slept in the master bedroom that night, and that he left home at approximately 6:30 A.M. on June 26.

At the conclusion of the interrogation, the defendant was booked and certain belongings were removed from his

---

[3] There was conflicting testimony as to the events subsequent to the defendant's arrival home. These events will be covered more fully in the discussion of the motions to suppress.

person and inventoried. Among the items were four hand-written notes. One, which was especially incriminating, appeared to be a list, including the words "gloves, over-alls, tape, bags, ether, mask."

At trial, the Commonwealth's evidence was circumstantial. The prearrest, pre-Miranda warning statement made by the defendant at the station, and the four notes were introduced in evidence.

1. *Motions to suppress.* Prior to trial, defense counsel filed three separate motions seeking to suppress (1) the oral statements made by the defendant at the Ipswich police station; (2) the four notes seized during the booking procedure; and (3) photographs showing scratches on the defendant's face, taken after his arrest. Haas claimed that his statement that he left his home at 6:30 A.M. on the day of the crimes was obtained in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). He also alleged that, as a consequence, his subsequent arrest was illegal and the fruits of the arrest — his further statements, the notes and the photographs — were tainted by the primary illegality. Haas argues that the Superior Court judge erred when he denied these motions.

It is undisputed that Haas made the critical statement prior to his having been advised of his Miranda rights. The crucial question is whether warnings were required at that time. The determination hinges on whether the police officers were conducting a "custodial interrogation." See *Miranda* v. *Arizona, supra* at 444.

After voir dire, the judge found that "[t]here was no police interrogation of the defendant prior to his arrest, either at the defendant's property, in the police cruiser, or at the police station," and that the defendant "was under no restraint, and not held in custody" when he accompanied the police to the inspector's office. It is this conclusion of law which we review.[4]

---

[4] The defendant also attacks the judge's findings on knowing and intelligent waiver of the Miranda warnings when given, and the voluntariness of Haas' statements. These findings are amply supported by the record, and thus we concern ourselves only with the initial interrogation and the requirement of Miranda warnings.

We are mindful that the responsibility of weighing credibility and finding fact is reposed in the trial court. In reviewing the testimony adduced at voir dire, we do not attempt to usurp that authority nor do we seek to exceed the limitations traditionally placed on us as an appellate court. Nevertheless, where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review. Our appellate function requires that we make our own independent determination on the correctness of the judge's "application of constitutional principles to the facts as found . . . ." *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977), quoting from the separate opinion of Mr. Justice Frankfurter in *Brown* v. *Allen,* 344 U.S. 443, 507 (1953). *Commonwealth* v. *Murphy,* 362 Mass. 542, 551 (1972) (Hennessey, J., concurring). See *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 (1975), cert. denied, 425 U.S. 959 (1976). After careful review of the evidence presented at voir dire, we hold that the denial of the motions to suppress the oral statements and the four notes was error.

We recount the evidence. On Haas' second call to the police station, he was told to come home but he was not told what the police had found at his home. At the time Haas arrived home, there were some people, mostly neighbors, milling about the area. The police were inside and outside the house.

The Haas home had been closed to all but police personnel in order to preserve the crime scene and to secure whatever evidence was available. The chief of police knew that murder-suicide had been virtually ruled out by the medical examiner; further he knew that it was the medical examiner's opinion that the three victims had died at approximately eight hours earlier at 3 A.M. When the chief talked with Officer Rauscher and Inspector Surpitski, the chief told one of them not to let Haas into the house but to take Haas to the station, tell Haas what happened to his family and then ask Haas what time he left for work that morning.

While the chief was in the house, Haas, accompanied by

Christensen, arrived home. As Haas ran up the driveway, Officer Rauscher put his hand around Haas' back and motioned him to get into the police cruiser. Haas asked if his companion could go along, and the officer said, "Yes."[5] On the way to the station Haas asked if someone would "please tell [me] what's going on?" Officer Rauscher replied, "We will only be a few more minutes, we will be at the police station, we will talk to you there."

At the station, the four men went into the inspector's room where the defendant was told his family had "expired." Almost immediately thereafter, Officer Surpitski asked the defendant what time he left for work, and the defendant said 6:30 A.M. This officer then called the chief of police and informed him of the defendant's statement and of the scratches which had been observed on the defendant's neck. The chief ordered the defendant's arrest.

Haas argues that his encounter with the officers and his subsequent journey with them to the Ipswich police station constituted an arrest without probable cause, illegal under the Fourth Amendment to the United States Constitution, and that illegal arrest "tainted" the subsequent taking of his statements, notes and photographs. See *Brown* v. *Illinois,* 422 U.S. 590 (1975); *Wong Sun* v. *United States,* 371 U.S. 471 (1963). The Commonwealth, conceding — in our view correctly so — that the police did not have probable cause to arrest Haas at his house, argues that Haas was not arrested at all, but voluntarily accompanied police to the station. The Commonwealth argues that there was no "custodial interrogation" of Haas until after his arrest. We disagree. We need not attempt to pinpoint the precise time at which the defendant was placed under arrest. A person's right to Miranda warnings depends on whether there is a "custodial interrogation" and whether, during the course of that interrogation, the person has been "deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra* at 444.

---

[5] The Commonwealth's account of what transpired is accepted by us, as it is the version found credible by the trial judge.

There is little doubt that Haas' incriminating statement was made in response to an interrogation, which has been defined as "questioning initiated by law enforcement officers," *Miranda* v. *Arizona, supra* at 444. Any suggestion that it was offered spontaneously is not supported by the record. Cf. *Hicks* v. *United States,* 382 F.2d 158 (D.C. Cir. 1967). Whether the questioning constituted a "custodial interrogation" presents a much closer question, but, considering the evidence in a light most favorable to the Commonwealth, we conclude that it did.

Miranda warnings must precede police questioning whenever that person is "deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra* at 444. See *Orozco* v. *Texas,* 394 U.S. 324 (1969); *Mathis* v. *United States,* 391 U.S. 1 (1968). There is no specific formulation on which we can rely as an aid in determining whether a person's freedom of action is sufficiently curtailed so as to require the so called Miranda warnings.

Courts have emphasized various factors critical to our inquiry. One factor always considered particularly relevant is the place at which a suspect is questioned. See generally Annot., 31 A.L.R.3d 565, 583-646 (1970). In the present case, Haas was not questioned on his arrival home. He was not questioned outside of the home nor was he escorted to any one of the several adjacent homes in the neighborhood.[6] The officers who initially blocked Haas' entry into his home were directed specifically to take him to the police station, to advise him of the deaths, and to ask him what time he departed from home that day. During the ride from his home to the station, Haas made inquiry as to what was transpiring, and one officer, according to the testimony at the suppression hearing, told him to wait until they arrived at the station house. Thus, the questioning took place in the environs of the Ipswich po-

---

[6] Thus, the interrogation could not properly be characterized as "on-the-scene questioning." Cf. *Sciberras* v. *United States,* 380 F.2d 732, 733 (10th Cir. 1967). Such questioning does not require prefatory warnings. See *Miranda* v. *Arizona,* 384 U.S. at 477; Annot., 10 A.L.R.3d 1054 (1966).

lice station by conscious decision of the police. See, e.g., *Proctor* v. *United States,* 404 F.2d 819 (D.C. Cir. 1968). The station house atmosphere is generally most conducive to successful interrogation because the investigator "possess[es] all the advantages." *Miranda, supra* at 450. Cf. *Beckwith* v. *United States,* 425 U.S. 341 (1976); *Commonwealth* v. *Johnson,* 372 Mass. 185, 194 (1977); *Commonwealth* v. *Borodine,* 371 Mass. 1, 4 (1976), cert. denied, 429 U.S. 1049 (1977). A humane attitude assumed by the police is a recognized means of leverage. *Miranda, supra* at 451. Thus, the Commonwealth's argument that the police were motivated by humanitarian concerns does not detract from the atmosphere which the law often recognizes as coercive nor does it obviate the need for Miranda warnings.

Another pertinent fact is whether the investigation had begun to focus on the defendant. *United States* v. *Carollo,* 507 F.2d 50 (5th Cir. 1975). See *Miranda* v. *Arizona, supra* at 444 n.4. The chief of police knew that the deaths had occurred eight hours earlier, and that murder-suicide had been ruled out by the medical examiner. The chief instructed his men to take Haas to the police station, tell him what happened, and to ask Haas what time he left in the morning. The question was prefaced by a statement, "Now, this is important." A few minutes after answering this question Haas was arrested.

Additionally, Haas was deprived of his freedom to enter his own home. While we need not decide whether the police's action in refusing Haas entrance into his own home in the interest of preserving the crime scene deprived Haas of his freedom of action in a significant way so as to require Miranda warnings, we think that, in light of the chief's knowledge and instructions, it is a factor to be considered in this case.

Further, the fact that the officers refused to answer Haas' question in the cruiser, and deferred all conversation until they arrived at the police station, tends to support our conclusion that the questioning of Haas as to the time he left home on June 26 was a "custodial interroga-

tion" which should have been preceded by Miranda warnings.[7]

Haas next claims that his subsequent custodial statements are tainted by the initial illegality, cf. *Brown* v. *Illinois*, 422 U.S. 590 (1975); *Wong Sun* v. *United States*, 371 U.S. 471 (1963), and therefore they must be suppressed on retrial, notwithstanding the fact that those statements were preceded by full Miranda warnings and by Haas' knowing and intelligent waiver of rights.[8] Since the proper police questioning followed so closely their illegal interrogation, we cannot discern a break in time or the stream of events sufficient to insulate the latter statements from the events which went before. See *Darwin* v. *Connecticut*, 391 U.S. 346, 349 (1968); *Gilpin* v. *United States*, 415 F.2d 638 (5th Cir. 1969). "Warning after the admission is too late, and the bare fact of subsequent repetition . . . cannot make the admission admissible." *United States* v. *Pierce*, 397 F.2d 128, 131 (4th Cir. 1968). " '[T]he cat was out of the bag'. One confession led to another. The effect of the tainted confession was not dissipated by the time of the next confession. A belated adequate warning could not put the cat back in the bag." *Gilpin* v. *United States, supra* at 642. Accordingly, Haas' statement subsequent to his receipt of the Miranda warnings, especially in light of its "temporal proximity" to the illegally obtained statement and without the "presence of intervening circumstances," *Commonwealth* v. *Fielding*, 371 Mass. 97, 113-115 (1976), quoting from *Brown* v. *Illinois*, 422 U.S. 590, 603-604 (1975), must also be sup-

---

[7] The Commonwealth relies on *Oregon* v. *Mathiason*, 429 U.S. 492 (1977). That case is distinguishable by the fact that Mathiason came and left by his own choice. He arrived unaccompanied by anyone, and after the interrogation he was free to leave. To the same effect see *Commonwealth* v. *Simpson*, 370 Mass. 119, 125 (1976).

[8] The judge found that Haas' statements were made voluntarily after a knowing and intelligent waiver of Miranda rights. These findings are fully supported by the record which shows that Haas (1) indicated that he understood his rights and (2) stated unequivocally that he desired to be "helpful." See *Commonwealth* v. *Borodine*, 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049 (1977).

pressed. See *Commonwealth* v. *Mahnke*, 368 Mass. 662, 686-688 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *Tatro*, 4 Mass. App. Ct. 295, 302 (1976). But see *Commonwealth* v. *Harris*, 364 Mass. 236, 238-241 (1973); *Oregon* v. *Hass*, 420 U.S. 714 (1975); *Harris* v. *New York*, 401 U.S. 222 (1971).

Haas argues that since the police did not have probable cause to arrest him until after he told them what time he left for work, his arrest was effected without probable cause and that, therefore, the evidence produced when his personal effects were inventoried and the photographs reflecting scratches about his face must also be suppressed.

Probable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police officers were sufficient to warrant a prudent person in believing that the person arrested had committed or was committing an offense. *Beck* v. *Ohio*, 379 U.S. 89 (1964). *Commonwealth* v. *Snow*, 363 Mass. 778, 788 (1973). *Commonwealth* v. *Andrews*, 358 Mass. 721, 723 (1971). Absent the information obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966), we believe that the police did not have knowledge of sufficient facts and circumstances reasonably to conclude that Haas was the murderer. Indeed, the Commonwealth so conceded at argument. The police knew that Haas' wife and two children had been killed; that the defendant was their husband and father and that the house was in good order with a key in the front door lock. There were scratches on Haas' face which arguably were visible prior to the eliciting of Haas' statement.[9] However, these facts do not place Haas in the house at the time of the crimes directly or circumstantially. In our view, therefore, the evidence is insufficient to constitute probable cause.[10]

---

[9] The record indicates that, although the scratches were visible and had been observed by a number of persons, the officers themselves first saw the scratches in the inspector's room at the police station just prior to or at the time they obtained the incriminating admission.

[10] Our view is confirmed by the fact that the police themselves did not think they had probable cause to arrest Haas until the incriminat-

Where probable cause is established pursuant to a violation of *Miranda,* the arrest is invalid. Cf. *Parker* v. *Estelle,* 498 F.2d 625 (5th Cir. 1974); *United States* v. *Cassell,* 452 F.2d 533, 541 (7th Cir. 1971); *In re Appeal No. 245,* 29 Md. App. 131, 151 (1975); *People* v. *Paulin,* 25 N.Y.2d 445, 451 (1969); *State* v. *Mitchell,* 270 N.C. 753, 757 (1967); *Commonwealth* v. *Leaming,* 432 Pa. 326 (1968); *Noble* v. *State,* 478 S.W.2d 83 (Tex. Crim. App. 1972).

Since we conclude that the arrest of Haas was not based on probable cause, it follows that the four notes seized at the station house must also be suppressed; it is black letter law that the fruits of a search conducted pursuant to an invalid arrest are inadmissible as substantive evidence at trial. *Beck* v. *Ohio,* 379 U.S. 89 (1964). Cf. *Walder* v. *United States,* 347 U.S. 62 (1954).

The defendant's final contention on his motions relates to the admissibility of the photographs made after his arrest illustrating the scratch marks which were visible on his face. He claims that they, too, would not have been obtained had not the illegal arrest been made. However, the scratches were plainly visible to a number of observers both before and after arrest. Thus the evidence would have been discovered without exploitation of the "primary illegality." *Wong Sun* v. *United States, supra* at 488. Where the nexus between the conduct of the police deemed illegal and the discovery of the challenged evidence is so attenuated as to dissipate the taint, such evidence is admissible. *Id.* at 487. *Commonwealth* v. *White (No. 3),* 365 Mass. 312, 315 (1974), cert. denied, 419 U.S. 1111 (1975).

2. *Final arguments to the jury.* Once again we are confronted with charges and countercharges concerning the summations of counsel. Haas claims that the prosecutor impermissibly encroached on the right to remain silent. *Doyle* v. *Ohio,* 426 U.S. 610 (1976). The Commonwealth's response is that Haas failed to object; that its remarks were provoked by defense counsel, and lastly that its com-

ing admission was obtained. The Commonwealth did not urge either the judge or this court to find that the police possessed probable cause at the house.

Commonwealth *v.* Haas.

ments were appropriate and related solely to precustodial silence. Both final summations were improper.

We recognize that it is essential to our present day adversary system that trials be vigorously prosecuted and vigorously defended. We are aware that trials take place neither in academic halls nor under laboratory conditions and that "[g]reat latitude should be permitted to counsel in argument." *Commonwealth* v. *Pettie,* 363 Mass. 836, 840 (1973). Nevertheless, final arguments cannot be freewheeling, extemporaneous verbal slugfests. Lawyers shall not and must not misstate principles of law nor may their summations infringe or denigrate constitutional rights. Advance preparation would eliminate from our consideration most aspects of closing arguments constantly being urged as improper.[11] We remind counsel that we shall not tolerate misconduct by lawyers during the persuasion phase of a criminal trial.

---

[11] "One of the first things to be considered in argument is *preparation.* It is indispensable to good argument that it be well-founded, logical, reasonable, and sufficiently interesting to hold the attention of the jurors. There are a few geniuses in our profession who can do this on the spur of the moment, but they are exceedingly rare. For most of us, the best technique is to make an outline of the argument before the trial begins, and then as the trial progresses it can be supplemented and revised so that just before actual presentation of your argument an orderly and effective arrangement of these points can be made quickly. This practice not only prevents the omission of a point but also encourages more concise, logical, and interesting presentation. It is the duty of . . . [counsel] in [her or] his summation to fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury. This cannot be *done effectively without preparation from the beginning of the trial*" (emphasis supplied). Bowler, Oral Argument in Criminal Prosecution, 52 J. Crim. L. 203 (1961).

"Law suits are won during the trial, not at the conclusion of it. They are won by the witnesses and the exhibits and the manner in which the lawyer paces, spaces and handles them. The likelihood of a lawyer snatching victory from the jaws of defeat with his or her closing argument is so slight as to hardly warrant consideration. . . . On the other hand law suits are lost by fumbling, stumbling, incoherent, exaggerated, vindictive closing arguments. This is not intended to minimize the importance of closing arguments. It is merely to relegate it to its proper position which is a summation of the evidence which has preceded it and a relation of that evidence to the issues in the case." See K.S. Broun & J.H. Seckinger, Problems in Trial Advocacy, 159-160 (1977-1978).

We turn now to consideration of the final arguments in this case.

In his closing argument, the assistant district attorney emphasized to the jury that at no time did Haas say that he did not kill his wife and children.[12] Though defense counsel did not object to this line of argument, he did request instructions directing the jury to disregard for all purposes the defendant's failure explicitly to deny his guilt during the interrogation.[13] The judge declined to give these requested instructions, and exceptions were duly noted.

As a preliminary matter, the Commonwealth urges that Haas has waived his right to raise this issue on appeal because his trial counsel failed to object during the course

---

[12] The full text of these comments is as follows: "And don't you recall that at no time did he ever say 'I didn't do it. I didn't do it.' And he never ever said what happened, specifically what happened. 'I want to know.' In fact, we still don't know how he ever officially found out what happened to his wife and kids. He never asked anyone. As soon as he was told they were dead, bang, the curtain rings down. He knew it already. No need to ask any further questions. And in that particular set of circumstances, wouldn't it be logical for a person to (want to know some details? And I am not talking about the rectal temperature and liver temperature and things like that. Wouldn't you want to know, 'What do you mean they are dead? How did it happen?' "

The prosecution made an abortive attempt to pursue this line during presentation of its case in chief. Haas' friend, Christensen, was asked whether during the station house interrogation the defendant denied his involvement in the killings. On objection, the question was struck. When Haas testified in his own defense, the prosecution attempted to impeach him by asking, "[D]id you ever tell any of the police officers there that you did not kill your wife and your two children?" Again, the question was excluded.

[13] The requested instructions were as follows:

"39. In this Commonwealth, a person being interrogated under circumstances which reveal that he is suspect of crime, may refuse to make statements and no inferences can be drawn adverse to the defendant as a result of his failure to make statements. Article 12, Declaration of Rights of the Constitution of Massachusetts.

"40. A person being questioned by the Police may reasonably fear (without any consciousness of guilt whatsoever) that anything he says will be distorted, misquoted, or used as the basis of argument unfairly and therefore, his failure to make statements or ask questions in such circumstances cannot be considered by you as consciousness of guilt or otherwise used as the basis of drawing adverse inferences against the defendant. *Commonwealth* v. *Burke,* 339 Mass. 521 [1959]."

of the prosecutor's allegedly improper closing argument. We have held, however, that failure to object during that phase of trial does not preclude appellate consideration of the claimed error where defense counsel requests a curative instruction at the conclusion of closing argument. *Commonwealth* v. *Gouveia,* 371 Mass. 566, 571-572 (1976). *Commonwealth* v. *Killelea,* 370 Mass. 638 (1976). *Commonwealth* v. *Nordstrom,* 364 Mass. 310 (1973). In the instant case, defense counsel brought the alleged error to the judge's attention, and thus preserved the point for appellate review. Therefore, we shall address the merits of the claim.

In stating to the jury during the course of closing argument, "And don't you recall that at no time did he ever say, 'I didn't do it. I didn't do it,' " the prosecutor invited the jurors to draw an adverse inference from Haas' failure to deny his guilt. Had the question been put to Haas directly, he obviously could have declined to answer, *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and this refusal to answer could not have been used inferentially at trial either for impeachment purposes, *Doyle* v. *Ohio,* 426 U.S. 610 (1976), or as substantive proof of guilt. *Id.* at 634 (Stevens, J., dissenting).

However, at no time was Haas asked directly whether he committed these crimes. Thus, the Commonwealth asked the jury to infer guilt from the mere fact that Haas did not spontaneously volunteer that he was innocent. It hardly need be said that no person being interrogated bears this burden. To hold otherwise would be to derogate substantially from the rights guaranteed by the Fifth Amendment to the United States Constitution, by our Declaration of Rights, art. 12, and by the decision in *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

The judge appears to have ruled the requests inapplicable on the ground that Haas did not remain silent but instead chose to speak with police. Inconsistencies between what the defendant told the police and what he testified to at trial might have been brought out by cross-examination. Comment on such inconsistencies is appropriate. See

*Commonwealth* v. *Belton,* 352 Mass. 263, 270, cert. denied, 389 U.S. 872 (1967). However, the thrust of the argument made in this case clearly requested the jury to draw an inference adverse to Haas from his failure to deny his guilt voluntarily.

The Commonwealth contends that this particular comment was restricted to underscoring the inferential effect of Haas' failure to deny his guilt *prior to* his actual arrest and receipt of Miranda warnings. The relevant portion of the closing argument indicates that the prosecutor did not so confine his remarks. Even if the argument were limited to Haas' prearrest failure to proclaim his innocence, we note that not until Haas and the officers arrived at the police station was Haas told of what the police had found. Thus, it is sheer nonsense to say that, prior to that time, Haas had to proclaim his innocence. To reach this conclusion, we would have to find that it is natural for one *not accused* of the commission of a particular crime to deny complicity in the crime. We decline to do so. After Haas was told his family had expired and he regained some composure he was interrogated. At the time of the interrogation Haas had the right to remain silent (see part 1, *supra*), and he was under no obligation to say anything, nor did he have an affirmative duty to deny his guilt. The record does not support the Commonwealth's contention that failure to deny guilt in this case amounted to a tacit admission by Haas. "This is not a case where a criminal defendant ... remained completely silent in the presence of a person making accusations against the defendant, concerning matters within the defendant's knowledge, which the defendant heard and understood *and which it would have been natural for him to deny*" (emphasis added). *Commonwealth* v. *Sazama,* 339 Mass. 154, 156 (1959). Cf. *Commonwealth* v. *Boris,* 317 Mass. 309, 317-318 (1944); *Commonwealth* v. *Kenney,* 12 Met. 235, 237 (1847).

The Commonwealth contends that the comment was permissible because defense counsel put Haas' conduct during the interrogation in issue by urging, in his closing argument, that the jury draw favorable inference from the

defendant's failure to request an attorney after being informed of his right to do so. Accordingly, the Commonwealth argues, the prosecutor was entitled to "fight fire with fire."[14] *Commonwealth* v. *Smith*, 342 Mass. 180, 186 (1961).

We have stated that the Commonwealth may not attempt to have the jury draw inferences from the accused's decision to exercise his right to counsel. *Commonwealth* v. *Sazama*, 339 Mass. 154 (1959). "It... is not an admission... but an attempt to assert a constitutional right, which negates any inference of an admission. Such assertions by criminal defendants during police interrogations are not competent testimony against such defendants." *Id.* at 158. We deem it is similarly inappropriate for defense attorneys to attempt to draw inferences from a client's decision to submit to interrogation without the presence of counsel.

While we recognize the gross impropriety of defense counsel's closing argument, we do not believe that the transgressions of the prosecutor were thereby warranted. The Commonwealth's right to "fight fire with fire" is aimed at answering "prejudicial irrelevancy argued by opposing counsel," *Salter* v. *Leventhal*, 337 Mass. 679, 698 (1958), it is limited to "correct[ing] the erroneous impression for which the defendant himself was responsible." *Commonwealth* v. *Smith, supra* at 186.

In the instant case, the prosecutor did not object to the impermissible argument of opposing counsel. He did not seek to negate the inferential effect of that argument by reminding the jury that Haas did seek the representation

---

[14] In his closing argument, the defense counsel, in pertinent part, stated: "We also have some other indications of the state of mind of this defendant. After he has purportedly been told his rights as we are told and given a chance to call a lawyer, he doesn't call a lawyer. The first person he called was his sister-in-law. Now, that is not the act of a man who is trying to protect his particular rights because of the accusation of a crime. I submit to you the only reasonable inference that could be drawn from that fact is that Gordon Haas was alone in his grief and at that moment wanted to share that knowledge and that grief with someone he loved, someone in his family, his sister-in-law. And that's what he did."

of counsel. He did not request correction from the trial judge. See *Commonwealth* v. *Earltop,* 372 Mass. 199, 204-205, 206 (1977) (Hennessey, C.J., concurring). In our view, the remarks in this case invited the jury to draw an unwarranted inference without correcting the erroneous impression created by defense counsel. Under such circumstances the right of retaliatory reply is inapplicable.

3. *Other exceptions.* We proceed to examine those remaining assignments of error which raise significant issues that might reappear at Haas' retrial.

a. *Bifurcated trial.* Although Haas contemplated interposition of an insanity defense, he feared that evidence introduced for that purpose would be used to establish guilt in the event that he was found to have possessed the requisite criminal capacity. Accordingly, he moved for a bifurcated trial, requesting an initial trial on the merits, and, if found guilty, an additional hearing on the issue of criminal responsibility. His motion was denied.

We do not address the question whether this issue was adequately preserved for appellate review. We do note, however, that the trial judge acted properly in denying the motion in this case. See *Commonwealth* v. *Bumpus,* 362 Mass. 672 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974). Moreover, we believe that resort to the procedure established by G. L. c. 123, § 15, and clarified by the guidelines set out in *Blaisdell* v. *Commonwealth,* 372 Mass. 753 (1977), will adequately protect Haas' rights if he chooses at retrial to assert the defense of insanity.

b. *Expert testimony.* Haas attacks on several grounds the admission of the expert testimony of the Essex County medical examiner regarding the victims' time of death. First, he urges that the Commonwealth failed to establish that the witness possessed sufficient background, training and experience to qualify as an expert within his field. Second, he claims that the Commonwealth failed to demonstrate that there exists a developed and reliable field of knowledge on which the witness could draw in order to assist in the factfinding process. Finally, he argues that

the testimony was incompetent because it was formulated without the benefit of scientific theory or examination.

Qualification of a witness to offer an expert opinion on a given question is for determination of the judge as a preliminary issue of fact. *Commonwealth* v. *Seit, ante,* 83, 92 (1977). *DeJesus* v. *Hamel,* 349 Mass. 764 (1965). W.B. Leach & P.J. Liacos, Massachusetts Evidence 99-100 (4th ed. 1967). Such decisions are rarely reversed on appellate review. *Commonwealth* v. *Seit, supra,* and cases cited. The findings of the judge will stand unless the record contains no evidence which supports his conclusion. *Commonwealth* v. *Banuchi,* 335 Mass. 649, 655 (1957). In this case the judge's ruling is amply supported by the record. We perceive no error in permitting the medical examiner to testify.

In the instant case, the expert witness, who in the course of his duty had occasion to examine the bodies at 10:45-10:48 A.M. on the day of the crimes, testified at trial that he had estimated death to have occurred "[s]ix to eight hours" earlier. Haas claims that this field of knowledge has not been developed to such an extent as to enable an expert to estimate so precisely the time of death; thus, reasons Haas, the expert's opinion on the issue was conjectural and speculative and should have been excluded. Closely related to this argument is Haas' assertion that, even were this field of knowledge sufficiently developed, the medical examiner's opinion should not have been admitted because it was formulated at the scene without benefit of any scientific testing. We do not believe that either of these grounds mandated the exclusion of the testimony. Though the defendant presented us with documentation to the contrary, there is substantial authority establishing the reliability of estimations of time of death, and recognition of the procedure need not be universal, nor must it be proved infallible. *Commonwealth* v. *Fatalo,* 346 Mass. 266, 270 (1963). Criticisms of the procedure and the manner in which the expert's opinion was formulated were proper subjects of cross-examination, but criticism of techniques followed does not mean that the judge erred in

admitting the testimony. Differences of opinion among expert witnesses merely create a jury question. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54 (1975).

c. *Other rulings.* Haas claims that the trial judge committed numerous other errors, either by admitting evidence which Haas thought objectionable or by excluding evidence proffered by the defendant. Because none of these evidentiary issues is likely at retrial to reappear in the same context, we need not discuss at length the propriety of their disposition by the trial judge. Suffice it to say that we perceive no abuse of discretion in any of these rulings.

Accordingly, the judgments of the Superior Court are reversed, the verdicts set aside and the cases remanded for a new trial.

*So ordered.*

BRAUCHER, J. (concurring). I agree with all that is said in the opinion of the court. We are bound by decisions of the Supreme Court of the United States to hold that there was error both as to the motions to suppress and as to the improper argument of the prosecutor. As to the improper argument, I have nothing to add. But the rulings we are required to make under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), are unjust, and I think some comment on their practical effect is appropriate.

I assume, as apparently the court does, that there is sufficient evidence, apart from the suppressed evidence, to present a jury question as to the defendant's guilt. The defendant's statements, which we are required to suppress, were voluntarily made, and they bore significant indicia of reliability. If the defendant testifies at his new trial, they will be admissible to impeach his credibility. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-697 (1975), cert. denied, 425 U.S. 959 (1976). *Commonwealth* v. *Harris*, 364 Mass. 236, 238-242 (1973). *Oregon* v. *Hass*, 420 U.S. 714 (1975). *Harris* v. *New York*, 401 U.S. 222 (1971). *Walder* v. *United States*, 347 U.S. 62 (1954). Thus it is

highly probable that the jury at a new trial will not hear either the defendant's own testimony or his out-of-court statements. Although he testified in his own defense at the trial now under review, the prospect of impeachment will be a powerful deterrent at the new trial.

Thus to curtail the evidence to be heard by the jury is not to improve the reliability of the jury's verdict. The justification for the exclusion of reliable evidence is said to be the deterrence of improper police conduct. But here the police officers acted in good faith, attempting to observe proper legal standards. Their violation of those standards was not gross or wilful, was not of a kind likely to mislead the defendant, and did not create a significant risk that his statement that he left home at 6:30 A.M. may have been untrue. See Model Code of Pre-Arraignment Procedure § 150.3 (1975).

In these circumstances, I should ordinarily hope that an application for review by the Supreme Court might result in a refinement of that Court's pronouncements. If the objective is to communicate a message to the police, it is highly desirable that the message communicated be comprehensible and rational rather than confused and arbitrary. Only the Supreme Court can clarify the message authoritatively.

Unfortunately, in the present posture of this case, review by the Supreme Court seems quite unlikely. We order a new trial, and we do so under Federal compulsion, by reason of improper argument by the prosecutor. There is no likelihood that we are in error on this point. But we are also, in the interest of good judicial administration, giving final directions that reliable evidence must be excluded at the new trial. It would be highly desirable that the latter ruling be reviewed, and the Supreme Court appears to have jurisdiction to review such cases. *Miranda* v. *Arizona,* 384 U.S. 436, 498 n.71 (1966). But the posture of the case makes it unlikely that the Supreme Court will review a ruling that appears to be interlocutory. Hence this lament.

HENNESSEY, C.J. (dissenting in part). I concur in the majority's decision that there must be a new trial here, but I disagree with the majority's conclusion that there was not probable cause to arrest the defendant on the morning of June 26, 1976.

The practical effect, if my view as to probable cause were to prevail here, would be that the four handwritten notes seized from the defendant in the police search of his person would be admissible in evidence in the Commonwealth's case in chief at the new trial of the case. This evidence would include the note, properly described by the majority as "especially incriminating," which listed "gloves, overalls, tape, bags, ether, mask." This result would follow from reasoning that the search of the defendant was valid as pursuant to a lawful arrest on probable cause to believe that the defendant had committed a felony.

However, even if my view as to probable cause were to prevail, I would agree that the defendant's statements at the police station should be excluded at the new trial, for failure of the police to comply with Miranda requirements. Indeed, that failure, together with the improper argument of the prosecutor, are the reasons why I agree that a new trial must be ordered.

In appraising whether probable cause existed, I, of course, consider only the information available to the arresting and investigating officers at the time the defendant was taken to the police station. This was as follows. In his telephone call to the Ipswich police on that morning, the defendant stated that he had just received an anonymous telephone call to the effect that "black and white don't mix" and that his family had just been "taken care of." Thereafter, the Ipswich police officer who was dispatched to the Haas home to investigate found the front door ajar with a key in the lock. The officer then entered the house and discovered the bodies of Mrs. Haas and the children. The words "[b]lack and white don't mix," the same words which the defendant had previously related in his telephone call to the police, were written on

a sign in the bedroom. The house was observed to be in order, the windows appeared to be secure, and the back yard, which was muddy, contained no footprints. The medical examiner examined the bodies and informed the chief of police that each victim died between 3 and 5 A.M. He also noted that the fingernail on the middle finger of Mrs. Haas' right hand was broken. There were scratches on the right side of the defendant's face which were observed by the police at the police station that morning.

In my opinion this knowledge in the aggregate reached the level of probable cause. It is perhaps fair to say that the evidence is minimally adequate, and that judges might reasonably differ as to whether it is sufficient. Perhaps, too, an underlying difficulty is that the definition of "probable cause" has not previously been stressed in our cases. It may be that the appraisal by the judges tends to be subjective, rather than by objective standards. If this is true, it is an important deficiency in our administration of criminal justice, because few concepts are more important or have more frequent application than that of probable cause.

The usual language of definition is acceptable, but unsatisfactorily general. I accept the definition offered by the majority opinion, as far as it goes, viz.: "Probable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police officers were sufficient to warrant a prudent person in believing that the person arrested had committed or was committing an offense. *Beck* v. *Ohio,* 379 U.S. 89 (1964). *Commonwealth* v. *Snow,* 363 Mass. 778, 788 (1973). *Commonwealth* v. *Andrews,* 358 Mass. 721, 723 (1971)." This broad language, without more, leaves unanswered the vital question as to the degree or strength of the required belief. The vagueness of the language of definition would even permit an inference that proof beyond a reasonable doubt. is necessary. For that reason I think it is useful here to articulate as specific a definition as possible.

In my view probable cause should be held to mean simply "more probable than not" or "more likely than

not."[1] The substance of probable cause is a reasonable ground for belief of guilt, and this means less than evidence which would justify condemnation or conviction, but more than bare suspicion. See *Brinegar* v. *United States*, 338 U.S. 160, 175 (1949);[2] as to cases of "suspicion," see *Henry* v. *United States*, 361 U.S. 98 (1959);[3] *Terry* v. *Ohio*, 392 U.S. 1 (1968); *Commonwealth* v. *Almeida, ante,* 266 (1977); *Commonwealth* v. *Silva,* 366 Mass. 402 (1974).

I believe that most judges, experienced policemen, and lawyers concerned with the criminal process customarily apply the foregoing definition in practice, although they may not articulate it. Analysis in any given case probably consists for the most part of an empirical comparison with other known cases where probable cause was or was not found by a court to exist. This is the same practical approach which judges often take on the issue of directed verdicts. Articulating a definition of probable cause, in the words I have suggested, may serve to avoid differences of judicial opinion in some cases.

As to the case before us, I think the police were warranted in concluding, on the facts known to them, that it

---

[1] However, the American Law Institute's Model Code of Pre-Arraignment Procedure rejects the "more probable than not" test as imposing too onerous a standard on police, stating that the "mathematics" of such a standard would preclude some arrests as illegal which should not be precluded. See Model Code of Pre-Arraignment Procedure § 120.1 (1975), particularly Commentary at 295. I suggest that the code is itself casting unnecessary doubt on a difficult concept by rejecting "probable" and "more probable than not," which are words of common understanding.

[2] See also the following language in *Brinegar* at 175: "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved."

[3] In the *Henry* case, at 101, the Court stated: "And as the early American decisions both before and immediately after its adoption show, common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest. And that principle has survived to this day."

was "more likely" or "more probable" than not that Haas had committed the crimes. The probability that Haas, rather than an intruder, was the criminal arose from several facts: in the state of the security of the house, with the key in the front door lock; the scratches on Haas' face and the broken fingernail of Mrs. Haas; the estimated time of death at between 3 and 5 A.M., together with the probability that a husband and father would have been at home during those hours; and Haas' early awareness of the wording of the sign in the bedroom, which was guilty knowledge, if the fact of the anonymous telephone call were disbelieved.