### COMMONWEALTH
v.
### Thomas W. BOUGHTER, JR.

Indict. #032799

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

**June 1, 1981**

## MEMORANDUM OF DECISION ON DEFENDANT BOUGHTER'S MOTION
## FOR APPROPRIATE RELIEF IN THE NATURE OF SUPPRESSION OR DISMISSAL

The above-captioned defendant charged with arson of a dwelling known as Jado's, in Roxbury, in April, 1978, filed a motion for appropriate relief in the nature of suppression or dismissal upon the ground that the statements taken from the defendant by acts of the government, were obtained involuntarily, under the belief that the defendant was negotiating a "plea bargain" or that he was at the time receiving prosecutorial immunity.

The Court heard evidence, argument and received briefs. It makes the following findings of fact:

The defendant, now twenty-one, but twenty in July, 1980, and a graduate of Charlestown High School, and of average intelligence, had been arrested in 1979 for possession of alcohol and at that time received and understood Miranda warnings.

In February, 1980, Trooper Joseph Flaherty was assigned to the case. He learned that the witnesses would say that co-defendant Michael Joseph had said that Boughter and one Joseph Brennan had set the fire at Joseph's request.

On July 11, 1980, Trooper Flaherty called Boughter at home and said that he wanted to talk with him. Boughter agreed to meet and a rendezvous was established at the White Hen in West Roxbury. Flaherty and Trooper Francis O'Brien, in separate cars, met Boughter at the White Hen and asked him to accompany them to the office of the Attorney General in Boston. Flaherty told Boughter that they did not have a warrant for his arrest and that he did not have to come. Defendant Boughter agreed to come.

The three cars in convoy, with defendant usually between the cars of Flaherty and O'Brien, arrived in Boston and the trio went to the offices of the Attorney General, into the office of Sergeant Saccardo.

In the office Flaherty got out the Miranda card (Exhibit 1), read it to defendant and asked him if he understood. Defendant answered in the affirmative. Defendant himself read the card. He understood its contents and signed his name and date.

Defendant indicated willingness to talk and said he thought they wanted to talk to him "about the car". Flaherty said that they were looking into the fire at Jado's.

Michael Joseph up until this time was

the principal suspect. Boughter was a secondary suspect. The trooper's goal was to get Boughter to cooperate in building a case against Joseph. As of this time the troopers did not believe they had probable cause to arrest Boughter.

Trooper Flaherty told Boughter of the two witnesses who would say that Joseph had said that Boughter and Brennan had lit the fire for him. He also told Boughter that the penalty for arson of a dwelling was a 20-year felony.

Boughter declined to discuss the matter. Flaherty told Boughter that he had been authorized by the Attorney General to make Boughter a proposition that if he, Boughter, cooperated 100%, told the troopers all he knew about the fire, and testified at the grand jury and then a trial as to all he knew about the matter, the Attorney General would not seek an indictment against him and he would do all he could to immunize him from prosecution. Boughter inquired whether this meant that even if he testified and said he set the fire that nothing would happen to him. Flaherty said that those were the terms of the offer. Boughter asked for time to discuss the matter with his father.

Boughter had at all times been free to leave and did so about 9:50 a.m. The group arrived at the Attorney General's offices at about 9:00 a.m.; they had rendezvoused at the White Hen at about 8:30.

At about 2:35 p.m., Boughter called Trooper Flaherty and said that he wanted to come in and talk some more. Another rendezvous was arranged at the White Hen in West Roxbury where the three met, again each driving their own cars, and proceeded to Friendly's.

At Friendly's, Officer O'Brien read his form of Miranda warnings and defendant repeated that he understood them. Defendant read them and understood them. He questioned the portion (see Exhibit 2) that said "no promises" and asked why this was in where there had

been an agreement that he would not be prosecuted. O'Brien said it was in effect a regular form and had to be signed. Defendant signed it.

He then said that he, defendant, then told the troopers that he had not been able to reach his father but was certain that his father would advise him to cooperate and that he wanted to cooperate under the terms offered.

He then proceeded to tell what he knew about the fire, the statements heavily inculpating him, Brennan and Michael Joseph.

Defendant was not misled by the "no promises" language. He believed that the promise had been made and would be kept if he cooperated. He understood that he could stop answering questions at any time and seek an attorney. He understood that whatever he said could be used against him, if he did not keep his end of the bargain.

I infer that some time after July 11, 1980, defendant conferred with his father and other members of his family and an attorney and decided not to cooperate. The defendant is now serving with the Air Force in the State of New York.

Some time soon after Labor Day in September, 1980, defendant called Trooper Flaherty and said in substance, "I cannot cooperate with you because Michael Joseph is a good friend of mine". Flaherty replied, "The next thing will be a grand jury, and I hope Michael Joseph is a good friend because you are sticking your neck out for him." The troopers told the defendant that they were after Michael Joseph.

No one suggested that defendant take a polygraph test. While the defendant, the night before July 11, 1980 had been out late drinking, I infer that neither his senses nor his judgment were impaired on July 11, 1980. In his opening statement the defendant's counsel conceded that failure to give Miranda warnings by the Commonwealth was not the issue. The concern was rather with the voluntariness

of defendant's statements and that defendant was induced to waive his Miranda rights by trickery.

Miranda warnings are required as a precursor to custodial interrogation. Where a defendant is not in custody, such warnings may be desirable and therapeutic but are not constitutionally required. **Commonwealth v. O'Toole,** 351 Mass 627, 631 (1967); **United States v. Messina,** 388 F. 2d 393, 395 (2nd cir. 1968). In this case I find that defendant at no time felt that he was unable to leave. Therefore, where as here, defendant was at all times free to leave, Miranda warnings were not required.

However, although not required, Miranda warnings were still given. I find that defendant understood his Miranda and intelligently and knowingly waived them. (For the voluntary aspect of the Miranda warnings and voluntariness apart from Miranda, see **Commonwealth v. Garcia,** 1980 Mass. Adv. Sh. 21, 30-31.) Statements of the defendant cannot be used against him if they are not the result of his free and unconstrained choice, if his will was unfairly overborne or his capacity for self-determination critically impaired, considering the totality of all surrounding circumstances. See, **Schneckloth v. Bustamonte,** 412 U.S. 218, 225-226 (1973). The confession must be a product of a rational intellect and free will. **Townsend v. Sain,** 372 U.S. 293, 307 (1963).

Statements are admissible where the defendant's self-preservation mechanism has been overridden by pressures within his own personality, such as conscience, religious feelings, duty, etc., but not where they are overridden by fraud, insanity or compulsion of drugs. **Pea v. United States,** 397 F. 2d 627, **aff'd. on rehearing,** 397 F. 2d 627, 634 (D.C. Cir, 1968). The statements obtained by trickery are not admissible. In **Commonwealth v. Jackson,** 1979 Mass. Adv. Sh. 401, 407, 386 N.E. 2d 15, a defendant who initially chose to remain silent, was induced into making a statement when he was told by police officers that his girlfriend had already made a statement inculpating him. Defendant's statement was suppressed. Likewise in **Commonwealth v. Brant,** 1980 Mass. Adv. Sh. 1473, 406 N.E. 2d 1021, a defendant wished to remain silent but the police told him a co-defendant had made statements. The defendant apparently confirmed this directly with the co-defendant and then talked. The Court held that this was improper, citing **Rhode Island v. Innis,**—U.S.—, 100 S. Ct. 1682, 1690. The test is whether the officers should have known that their words and actions were likely to evoke an incriminating response. It was held to be a violation of Miranda rights.

In **Commonwealth v. Gallant,** 1980 Mass. Adv. Sh. 2031, 410 N.E.2d 704, defendant did not wish to talk, but when he was shown an inculpating statement from his brother, he decided to talk. The Court held that the statement was properly suppressed as defendant's rights had not been scrupulously honored.

In all the above cases, the defendant had indicated the desire to remain silent. In contrast, Boughter, here, expressed a willingness to talk.

The Commonwealth has sustained its burden of proving voluntary waiver of Miranda rights and voluntariness apart from Miranda, by a fair preponderance of the evidence. The beyond-a-reasonable-doubt test applies only when the voluntariness is submitted to the jury. See **Commonwealth v. Garcia, supra** at p. 42, **Commonwealth v. Mahnke,** 368 Mass. 662, 680 (1975).

The Court is satisfied that the defendant consciously, rationally and intelligently — therefore voluntarily — made the statement, apart from Miranda considerations, influenced, predominantly, by the promise of no prosecution.

However, at the time Boughter agreed to talk he did not correctly understand

what the subject matter was to be. Compare, **Commonwealth v. Haas,** 373 Mass. 545, 369 N.E.2d 692 (1977). Nonetheless, he understood that he had a right to stop talking at any time. He took several hours to think over the matter and then voluntarily, on his own, decided to make the deal. The troopers correctly understood what the evidence was against Michael Joseph and did not distort their summary of it to Boughter. **Commonwealth v. Haas, supra,** is distinguishable because there were no Miranda warnings given. Here they were given even though they were not technically required since there was no custodial interrogation.

Offering leniency to a lesser culprit, in order to convict a greater one, is a necessary tactic for prosecutors. When prosecutors promise not to prosecute, or to make more lenient recommendations, in exchange for cooperation from a witness, they must honor the commitment.

The Attorney General is the chief law enforcement officer of the Commonwealth and he can take over cases from district attorneys, G.L. c. 12, secs. 10 and 27; **Commonwealth v. Kozlowsky,** 238 Mass. 379 (1921); **Sturgis v. Attorney General,** 358 Mass. 37, 39 (1970); and he has an absolute power to **nolle prosequi** all cases from the return of the indictment up to the beginning of trial; **Commonwealth v. Dascalakis,** 246 Mass. 12, 18 (1923). The Attorney General is, therefore, in a position to make a binding promise that a witness will not be prosecuted. As to the enforceability of government's promise of immunity, see, **In Re DeSaulnier,** 360 Mass. 761, 764 (1971); **Commonwealth v. St. John,** 173 Mass. 566, 569 (1899). If given with the approval of the Attorney General, the Court will enforce. **United States v. Carter,** 454 F.2d 426 (4th Cir. 1972); **United States v. Paiva,** 294 F. Supp. 742 (D.C. Cir. 1969). See, **Brady v. United States,** 397 U.S. 742 (1970) on effective promises; **Commonwealth v. Knapp,** 27 Mass. 479, 492-493, 10 Pick, 477 (1830); **Commonwealth v. Morey,** 67 Mass. 461, 463, 1 Gray 461 (1854).

While the statements to defendant of the evidence inculpating him (as it was inadmissible in its then form) and the statement as to the possible penalty for arson were probably designed to put pressure on Boughter to cooperate, they failed. It was only the inducement of assurance of no prosecution that caused him to decide to talk. The two episodes were separated by several hours and a second set of Miranda warnings was given. See, **Michigan v. Mosley,** 423 U.S. 96, (1975) and discussion in **Commonwealth v. Brant,** 1980 Mass. Adv. Sh. 1473, 406 N.E.2d 1026.

## CONCLUSION

Even though the statements were induced by a promise, the Court finds that they were nevertheless a rational product of Boughter's unimpaired free will and choice, and represented a wise exercise of his capacity for self-determination. He knew of his guilt and the possibility that Joseph would turn state's evidence against him. He made an intelligent and rational balancing of threats and benefits and decided to cooperate.

If the government is held to its promises in such an arrangement, the defendant cannot complain if he breaches a condition of the promise, and that his voluntary statements are then used against him. **Commonwealth v. Knapp, supra; Lowe v. State,** 111 ML. 1, 16; 73A 637 (1909), citing **Commonwealth v. Knapp, supra; Camron v. State,** 32 Tex. Crim, 180, 181 S.W. 682 (1893).

## ORDER

Defendant's motion for appropriate relief in the nature of suppression or dismissal is denied.

**Robert J. Hallisey**
**Justice of the Superior Court**